# Illinois Official Reports

## Appellate Court

---

### *People v. Martinez*, 2019 IL App (2d) 170793

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELENA K. MARTINEZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-17-0793 |
| Filed | May 2, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 16-CM-3004; the Hon. Alexander F. McGimpsey, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jacqueline M. Aldrich, of Aldrich & Siedlarz Law, P.C., of Lombard, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Edward R. Psenicka, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices McLaren and Hudson concurred in the judgment and opinion. |

¶ 1        A jury convicted defendant, Elena K. Martinez, of battery (720 ILCS 5/12-3(a)(2) (West 2016)). She appeals, arguing that (1) the trial court abused its discretion in excluding evidence that the victim, Donald Amirante, was convicted of felony aggravated battery in 1962, (2) the jury's guilty verdict on count II of the information was logically inconsistent with its not-guilty verdicts on counts I and III, (3) she was not proven guilty beyond a reasonable doubt on count II, and (4) the trial court abused its discretion in sentencing her to conditional discharge rather than supervision. We affirm.

¶ 2                                  I. BACKGROUND
¶ 3                                 A. Pretrial Rulings
¶ 4        Defendant was charged with three counts of battery, arising from a September 28, 2016, physical altercation with Amirante in the parking lot of Advocate Good Samaritan Hospital (Good Samaritan) in Downers Grove. Counts I and II alleged the same underlying conduct, namely, that defendant struck Amirante in the head and face with her fist and also scratched him on the forehead with a pen. Count I alleged that this conduct caused bodily harm (*id.* § 12-3(a)(1)) to Amirante, while count II alleged that the conduct was of an insulting or provoking nature (*id.* § 12-3(a)(2)). Count III charged that defendant made further physical contact with Amirante of an insulting or provoking nature, namely, by spitting on him.

¶ 5        Prior to trial, defendant gave the State notice that she intended to present self-defense as an affirmative defense at trial. Defendant also filed several motions *in limine*. The first was a motion to exclude evidence that, sometime after the altercation, Amirante's car was vandalized where it was parked in the Good Samaritan lot. The State did not contest this motion.

¶ 6        The second motion *in limine* sought to exclude evidence of defendant's agitated state when she was arrested two hours after the incident. The trial court granted this motion, agreeing with defendant that the "intervening event of an arrest" diminished the relevance of defendant's state of mind as it existed two hours after the incident.

¶ 7        The third motion sought to introduce evidence that Amirante was convicted of felony aggravated battery 55 years earlier, in 1962. For this motion, defendant relied on the holding in *People v. Lynch*, 104 Ill. 2d 194, 200 (1984), that evidence of the victim's violent character is admissible to support a theory of self-defense. Defendant explained that she did not have a copy of Amirante's conviction or know the facts surrounding the offense; the State had simply noted the conviction in a supplemental disclosure. Defendant intended to proceed by simply asking Amirante whether he was convicted of the offense.

¶ 8        The State argued that evidence of the conviction would be more prejudicial than probative. The State emphasized that the conviction was remote in time and that Amirante had no subsequent criminal history.

¶ 9        In ruling on the motion, the trial court observed that the *Lynch* rule is codified in Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011), which states: "In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct." The court determined that evidence offered under Rule 405(b)(2) is also governed by Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), which

provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 10 The court ruled that the 1962 conviction was inadmissible. The court explained:

"In employing [an] analysis [under Rule 403], the Court looks to the nature of this evidence, which is merely the indication of a conviction for aggravated battery from 1962, some 55 years ago. There's no other factual context. There's no other indication of any acts of violence or convictions for acts of violence in the past 55 years other than this one case.

The Court does understand and considered the fact that it is an aggravated battery in the nature of the offense. But the Court does find that the probative value of that conviction is substantially diminished by the passage of time and the fact that the time period in which that occurred is so remote to the current incident.

So the Court does find that there is a substantial diminishment, if that's a word, or diminution of the probative value of that offense based upon the passage of time and the nature of the proof of that offense.

The Court also finds that there is some significant danger of unfair prejudice that the fact finder in this case could place undo [*sic*] emphasis on that particular conviction. And the question then is: Is the probative value so diminished that it is substantially outweighed by the danger of unfair prejudice?

And the Court is also well aware that the *Lynch* doctrine is based upon the fact that there is—this is a witness, not the defendant; and, therefore, this evidence comes in to show essentially the propensity of the witness. So the Court is aware of that distinct difference between if this were a conviction of a defendant as opposed to a witness.

But still the analysis of Rule 403 informs the Court. And based on the substantial passage of time, the nature of the method of proof, and the fact that it still—in the Court's mind, there is a significant possibility that the fact finder could place undue emphasis on this.

For those reasons, I'll—under Rule 403 I'll deny *** the motion *in limine* to include that 55-year-old conviction; and I'll find that it is not admissible based on Rule 403 and that the substantially diminished probative value is substantially outweighed by the danger of unfair prejudice."

¶ 11                                          B. Trial

¶ 12 The State's three witnesses were Amirante; his wife, Ruth Suranovich; and Downers Grove police officer Kevin Chapin.

¶ 13 Amirante testified that he was 74 years old at the time of trial. On September 28, 2016, at about 3 p.m., Amirante and Suranovich arrived at the nonemergency parking lot at Good Samaritan. They were there for Amirante's regular blood draw. On that day, he wore a T-shirt underneath a sweater. Amirante had a pen and a pad of paper in the front pocket of the T-shirt. Carrying these items was a daily habit that he developed while working in the insurance industry.

¶ 14        Amirante had used this same parking lot when he previously visited Good Samaritan for blood draws. Amirante denied that there are signs in the lot directing cars entering the lot to proceed to the right, or counterclockwise, around the lot. Amirante claimed that "people go both ways in the lot" and that, if traffic is supposed to proceed in one direction, it is a "well-kept secret."

¶ 15        When Amirante entered the lot on the afternoon in question, he observed a woman, later identified as Casey Adesugba, walking toward a car parked in the lot. Adesugba was holding a baby in a carrier. Rather than proceed around the lot counterclockwise, Amirante drove directly to Adesugba's car, activated his emergency blinkers, and waited while she secured her child in a car seat. Their cars were facing the same direction. After about five minutes, Amirante noticed behind him a car, whose driver was later identified as defendant. Defendant did not remain behind Amirante but drove back in the opposite direction, proceeded counterclockwise around the lot, and stopped to the right of Adesugba's car. Defendant then deployed her own blinkers. When Adesugba finished securing her child and backed out of the space, Amirante drove into the space past defendant's car, which was on his right. As Amirante passed defendant, her car "rush[ed]" at his. Amirante was "startled" and worried that defendant would strike the right side of his car. Defendant did not make contact, however. Amirante did not hear any honking or yelling when he pulled into the space. Amirante was in the lot about 5 to 10 minutes before he pulled into the space.

¶ 16        Amirante testified that Suranovich remained in the car while he exited and began walking on the sidewalk toward the hospital. Meanwhile, defendant parked her car in the aisle and "jumped out." She left her car door open as she approached Amirante. She yelled profanity and spit at him. Some of the spit landed on his front. Amirante told defendant to "relax" and said that he was in the parking lot 10 minutes before she was. When defendant reached Amirante, she began striking him in the face with her fists. She knocked off his glasses, which broke in the process. As defendant continued "flailing her arms" and striking him, Amirante "didn't have time to even think." He "just tried to grab on and hang on." He was not able to grab defendant's arms because she kept swinging. He then grabbed her hair, which was "the only thing [he] could think of." He did this to restrain, not hurt, her. After Amirante took hold of her hair, defendant scratched his face with her "extra long, curved" fingernails. Defendant also reached into the pocket of Amirante's T-shirt, snatched his pen, and stabbed him in the forehead with it. The pen broke in half, but defendant swung at him with the remaining half. When Suranovich approached and tried to intervene, defendant swung the remains of the pen at her, too.

¶ 17        Amirante denied that he yelled at defendant when she got out of her car. He also denied punching defendant or pushing her to the ground. During their struggle, they fell against a car. Defendant slid down the car and onto the ground, but rose again. Meanwhile, Amirante continued to hold her hair because he was afraid to let go. Amirante denied that Suranovich pushed his arms to get him to release defendant's hair. Amirante testified that he is five feet, seven inches tall.

¶ 18        Amirante testified that, a minute or two after the altercation began, persons he believed were hospital security officers arrived. The police followed soon after. The police separated defendant from Amirante and "immediately" photographed each of them as well as defendant's car. Amirante identified State Exhibit 1 as a photo that the police took of him at the scene. The photo shows bloody marks on Amirante's face, including, most notably, what

appears to be a rivulet of blood originating in his right upper forehead and extending down to the corner of his mouth. Amirante testified that he did not have any of these facial injuries before the altercation with defendant on September 28, 2016.

¶ 19 In State Exhibit 1, Amirante's sweater appears (at least, from what is visible) buttoned. Amirante testified, however, that the sweater "opened up" during his struggle with defendant and permitted her to get at his pen. After the incident, Amirante located the other half of the broken pen on the ground. He threw it aside because it was of no use to him.

¶ 20 Amirante also testified that, prior to the incident, there was a sac on his left forearm in which blood had collected due to a fall he previously sustained. During the altercation, the sac broke and blood began to spread subcutaneously throughout his arm. Amirante identified State Exhibit 2 as a photograph that his daughter took of him two days after the incident. In the photo, most of Amirante's left arm is a dark shade of purple. Amirante attributed the color to the blood that had spread from the sac when it broke. The photo also shows a bandage on Amirante's right upper forehead. Amirante explained that the bandage was covering the wound that defendant inflicted with his pen.

¶ 21 Amirante testified that he was treated in the emergency room after the incident. That evening, he went to the police station and provided a written statement of the incident. When he arrived, he was placed in a room off the lobby of the police station. An officer provided him a pen and a single sheet of paper and told him to write down what happened. The officer then left the room. Amirante identified defense Exhibit 1 as the single sheet of paper on which he wrote his statement. The exhibit is a preprinted form titled "Voluntary Statement." At the top of the form is a set of blank lines for the writer to identify himself. Below this first set is another set of blank lines reserved for the statement itself. Amirante identified his handwriting on both sets of blank lines. He wrote the following on the lines reserved for his statement:

"I was waiting for a parking space with my emergency blinkers on in the hospital parking. The offender came up and stopped to my right[,] waiting for the same spot. The other vehicle then left and I proceeded to park in the vacant space. After I parked and got out of my car to go into the hospital, the offender pulled up close to the back of [*sic*] car and jumped out and confronted me with profanity[,] yelling and spiting [*sic*] on me. I yelled back that I was waiting 10 mins. before she was. She then started striking me[,] breaking my glasses, and continued to fight with me. She took out my pen from [*sic*] pocket and stabbed me with it. I tried to hold her arms to no avail."

Below the blank lines was the following preprinted text: "I have read each page of this statement consisting of ___ pages(s), each page of which bears my signature, and corrections bear my initials. I certify that the facts contained are true and correct." Following this text was an area for the date and signatures. Amirante's handwriting extended below the blank lines and into the signature area.

¶ 22 Amirante acknowledged that his written statement omitted details to which he testified, including that he grabbed and held onto defendant's hair, Suranovich tried to stop the altercation, defendant swiped at Suranovich with the broken pen, and Amirante's blood sac was ruptured during the struggle. Amirante testified that he did not omit these details because he lacked time to include them in the statement. He wrote a "summary," not a "book," of what happened, and he included all the details he could remember at the time. He was not given a time limit for completing the statement and did not feel pressured or hurried in writing it.

¶ 23 Amirante testified further that the form did not have space enough for him to include more details. If the form "had room [he] would have put more in [his statement]," but he was given only one sheet of paper, and he presumed he could write only on the blank lines designated for his statement. Though the police officer did not say that Amirante was limited to the front of the sheet, Amirante assumed this was so because the sheet itself did not say that he could write on the back. Amirante testified: "[I]n my mind, *** when you come to the print here [at the bottom of the page], that's the end of what I can write." Amirante testified further:

"Q. So when the officer came back to the room why didn't you say, hey, I don't have enough space, all these other terrible things happened and I need to write it down for you? You didn't think to do that?

A. I did. I said—

Q. And what did the officer say?

A. I said is this all that I can—and he says, yes, that's good. And I—

Q. The officer told you you could only write that at the end?

A. No, *** I said, am I done with this or do I need more? And he said no, here, it's fine, and he took it."

¶ 24 Suranovich testified that she and Amirante went to Good Samaritan on September 28, 2016, because Amirante was on blood thinners and needed to have his blood checked. When they arrived, the hospital parking lot was crowded. They observed Adesugba approaching her parked car, and they drove up behind her car and waited. After a while, defendant pulled up on Suranovich's right and also waited for the space. Unlike Amirante, Suranovich had not seen defendant's car until it appeared on her right. When Adesugba's car vacated the space and Amirante began pulling into it, defendant's car "lurched forward." Suranovich believed at first that defendant's car would hit theirs, but there was no contact. Suranovich did not hear any honking or yelling as Amirante pulled into the space.

¶ 25 Suranovich testified that she remained in the car while Amirante went inside, as was their custom when they came for his blood draws. Suranovich did not pay attention to Amirante as he walked toward the hospital. She was alerted when she heard a loud voice and a commotion nearby. She exited the car and saw that defendant's car was now parked behind theirs, with its door open. She observed defendant "attacking" Amirante. His glasses were off, his face was scratched and bloody, and there was a "puncture wound" on his forehead. Defendant was striking Amirante with her "flailing" right hand as he was backing up, trying to avoid her. Amirante was also holding defendant's hair to keep her from hitting him. Suranovich did not see how Amirante's glasses were knocked off or how the altercation started. She also did not see Amirante push defendant or see them on the ground. Suranovich could not recall whether she saw Amirante strike defendant. She "remember[ed] a lot of arm movement, but whether there was actual impact [she did not] recall." Suranovich did not see defendant holding a pen.

¶ 26 Suranovich testified that she yelled for the two to stop and tried to get between them. A man arrived, who might have been a hospital security officer, and stopped the fight. The police then arrived. They spoke to Suranovich, Amirante, and defendant. The police also took photos of Amirante. Suranovich testified that State Exhibit 1 accurately depicted the injuries she saw on Amirante's face after the incident. Amirante did not have those injuries prior to the incident. Suranovich did not observe any injuries or blood on defendant's face. Defendant was extremely angry but not crying.

¶ 27 Chapin was the State's next witness. (We also incorporate here Chapin's testimony as a witness for the defense.) Chapin testified that, in the midafternoon of September 28, 2016, he received a dispatch that two people were fighting in the parking lot of Good Samaritan. When Chapin arrived, he saw defendant standing with security officers. Several other police officers arrived, including Sergeant Giancarlo, who took photographs at the scene. Since Chapin arrived first, he took the lead in the investigation. Chapin spoke to defendant first because she was irate and yelling and he wanted her to calm down, so he could determine what happened. Defendant was "verbally aggressive" as Chapin spoke with her, and it "was difficult for [him] to get a clear statement *** of what transpired in the parking lot." Defendant told Chapin that she was waiting for a parking space when Amirante pulled into it ahead of her. She exited her vehicle in order to "confront" Amirante for taking the spot, and he "attacked" her. Amirante struck her several times in the face, including her right eye. Chapin asked defendant whether Amirante struck her with open hands or fists, but she did not say. The only evidence of injury Chapin observed on defendant was a red mark on the top of her right hand. Defendant could not explain how she received the mark. Chapin saw no bruising on defendant's face. Chapin acknowledged that people develop bruises at different rates, but he noted that bruising is usually preceded by some kind of inflammation or swelling, particularly if the injury is from a closed fist. As neither Chapin nor Giancarlo saw evidence of injury to defendant's face, Giancarlo did not photograph her.

¶ 28 Chapin could not recall whether defendant complained of pain. Chapin was asked if he told defendant that her face was inflamed only because of crying. Chapin testified that he could not recall specifically what he told defendant, but he reiterated that "in this case there was not something to photograph that would indicate that a battery took place with injuries being sustained to [defendant's] face." Chapin did recall defendant asking for medical treatment, and he referred her to the emergency medical personnel at the scene.

¶ 29 When Chapin first observed Amirante and Suranovich, they were distraught and crying. Chapin noticed on Amirante's face a "moderate amount of blood that was mostly dried." The blood was in streaks and looked like scratches. Chapin testified that State Exhibit 1 was the photo that Giancarlo took of Amirante at the scene and that it accurately depicted the condition of Amirante's face as Chapin observed it.

¶ 30 Chapin spoke to Amirante alone. Chapin recalled that Amirante claimed that defendant struck him and also scratched him with a pen that he kept in his pocket. Chapin could not recall if Amirante specified that the pen was in his shirt pocket or his sweater pocket. Amirante did not show Chapin where the pen ended up, and Chapin and Giancarlo tried unsuccessfully to locate the pen in the parking lot. Chapin did not recall Amirante claiming that defendant spit on him, and Chapin observed no spit on Amirante's person. Later in his testimony, Chapin was allowed to refresh his recollection with his written report of his interview with Amirante. Chapin confirmed that, according to the report, Amirante claimed that defendant struck him and also scratched him with a pen. Chapin testified that the report did not mention any claim by Amirante that defendant scratched him with her fingernails or that she swiped at Suranovich with the pen. Chapin would have reported such "pretty significant" details if Amirante had shared them.

¶ 31 Chapin testified that he spoke to Suranovich as well. Suranovich did not report that defendant spit on Amirante.

¶ 32    Chapin also interviewed Adesugba. She did not report seeing Amirante strike defendant or force her down on her knees. Adesugba did report seeing defendant grab at Amirante's face. Adesugba also told Chapin that she did not know who was the aggressor in the conflict. Adesugba did not provide Chapin with a written statement.

¶ 33    Chapin testified that he asked Amirante to come to the police station later on September 28 to provide a written statement. Chapin did not ask any other witness to do so. Chapin provided Amirante a one-page statement form and gave him instructions for filling it out. He told Amirante to write his statement on the blank lines and offered him continuation forms if he needed more room to write. As was his practice with witnesses, Chapin told Amirante to provide, in his own words, an account of what happened, including as many details as possible. Chapin told Amirante to let him know when he was done. Amirante said that he understood the instructions. Per his usual practice, Chapin sat at the end of the room opposite from Amirante as he filled out the form. Chapin did not want witnesses to feel "coerced or *** coached into writing something that they wouldn't want to otherwise write." At no time while he was writing did Amirante claim that he did not have enough space on the single sheet or ask Chapin for more paper. Amirante also did not ask Chapin if what he wrote was appropriate. Chapin never told Amirante that he had written enough and did not need to add more. Nor did he ask Amirante if he was done yet or tell him to stop writing. Both Chapin and Amirante were calm and relaxed during the process.

¶ 34    Defendant's four witnesses were defendant, Chapin (whose defense testimony, as noted, we incorporated above into his testimony for the State), Downers Grove police sergeant Jason Glaser, and Adesugba.

¶ 35    Glaser testified that, on October 4, 2016, he was working a day shift at the Downers Grove police station. Defendant came to the station in the early afternoon and asked for someone to take photographs of injuries she sustained in connection with an incident that occurred several days earlier. Based on his review of shift summaries, Glaser knew that Chapin was the reporting officer of the incident to which defendant referred. Defendant complained to Glaser of injuries to her left eye, left shoulder, and left forearm. She did not mention her right eye, nor did Glaser see any injury to it. Glaser identified defense Exhibits 2 through 4 as the photos he took of defendant. The photos show bruising to defendant's left eye, left shoulder, and left forearm. Glaser did not recall defendant telling him how she sustained the injuries, and Glaser did not ask. After he took the photos, Glaser put them on a CD and gave them to Chapin when he reported for his next shift.

¶ 36    Adesugba testified that she was at Good Samaritan on September 28, 2016, for a follow-up appointment after having given birth to her daughter. Adesugba identified defense Exhibits 5 through 8 as photographs of the parking lot that she used while visiting Good Samaritan. As Adesugba noted, the photos show painted arrows on the parking lot surface, directing cars to proceed counterclockwise around the parking lot. When Adesugba arrived at the hospital, the parking lot was "busy" and she parked in one of the few open parking spaces.

¶ 37    As she walked to her car after the appointment, Adesugba did not notice any cars waiting for her parking space. As she was securing her child in the car seat, Adesugba noticed defendant's car behind and to the right of hers. The car's right blinker was on. After she finished securing her child, Adesugba saw another car, Amirante's, directly behind her. Adesugba became concerned that there would be an "issue" over her parking space. Due to the position of Amirante's car, Adesugba was unable to proceed counterclockwise out of the lot

but had to proceed in the opposite direction, contrary to the signage. On her way out of the lot, Adesugba heard a car honk. As she continued to circle around the lot, Adesugba saw, in her peripheral vision, two individuals—Amirante and defendant—fighting in the grass next to the cars that had been waiting for her space. Adesugba noticed that Amirante's car doors were closed but that defendant's car door was open.

¶ 38    Adesugba testified that, upon seeing the altercation, she stopped her car about three cars away from the fight. She exited her car and saw Amirante strike defendant several times in the face with a fist and an open hand. Adesugba saw defendant flailing her arms but did not see her strike Amirante. Adesugba witnessed Amirante hold defendant's hair and force her down to the ground. Amirante initially held defendant on the ground but then "pulled her up by her hair." Defendant was trying to get away from Amirante but could not because he was holding her hair. Adesugba heard yelling and commotion from the altercation but could not make out any words. She called 911.

¶ 39    Adesugba testified that, as she walked closer to Amirante and defendant, she saw that Amirante's face was bloody. He appeared angry while defendant appeared scared. Adesugba described Amirante as taller than defendant. Adesugba admitted that she did not know who started the fight.

¶ 40    Adesugba was asked what she told Chapin at the scene. She testified that she told him that she saw Amirante hold defendant's hair and strike her. She did not tell Chapin, or at least could not recall telling him, that she saw defendant grab Amirante's face. Adesugba testified that she did not tell Chapin that Amirante kept defendant on her knees by holding her hair; she indicated that fact only in a written statement that she gave at the scene. On further questioning, Adesugba admitted that she did not recall speaking to any officers at the scene but recalled only providing them a written statement of what she had observed.

¶ 41    Defendant testified that she was married, had one child, and was pregnant with her second child. She was a registered pharmacist.

¶ 42    Defendant testified that she arrived at the parking lot of Good Samaritan at about 3 p.m. on September 28, 2016. She had a 3 p.m. appointment. Upon entering the parking lot, she drove counterclockwise per the directional signage. As she drove in the parking lot, she spotted Adesugba leaving the hospital with her daughter. Following Adesugba to her car, defendant stopped, activated her blinker, and waved to let Adesugba know she was waiting for the parking space. As she waited, defendant did not see any other cars waiting for the space. When Adesugba backed out of the space, Amirante's car appeared. He drove past the front of defendant's car and into the space. Amirante had proceeded contrary to the signage. As Amirante was pulling into the space, defendant honked her horn because she assumed that Amirante had not seen her waiting for the space. Amirante did not back out of the space, however, but exited his car. Defendant then decided to approach Amirante just to ask if he had seen her waiting for the space:

"I had a 3:00 p.m. appointment that day, and I was running a little bit late and, honestly, seeing that they were elderly, I just assumed that they didn't see me, so I figured by getting out of the car and asking them did you see me that they would have been, like, no or yes, and that would have been the end of it. They would have moved. I mean, I go to other parking lots and have done that before and I didn't see any problem with that."

¶ 43    Defendant pulled her car over to the side to make room for other cars. She then exited her car, leaving the engine running and the door open. She walked toward Amirante and asked if

he had seen her waiting for the space. She did not yell at Amirante but asked her question in a normal voice. When he did not answer, she assumed that it might have been because of his age, and she continued toward him. Amirante then "started to yell at [her] saying that he had been waiting for ten minutes for this parking stall." Amirante then spit in her face. When defendant protested, he punched her in the face, first with his left fist and then with his right fist. He struck her on both sides of her face and also on her left ear. Amirante then grabbed her hair, wrapping it around his wrist. He pulled her down by her hair until her upper body was parallel to the ground. As she tried to pull away from him, she backed into a car that was behind her. Amirante then brought up his right knee and struck her in the face and left eye. Defendant screamed for help and for Amirante to stop, but he continued to hit her. She flailed her arms above her head, not able to see because she was still bent over. At one point, defendant was down on the ground and Amirante pulled her up by her hair. Suranovich came over and screamed for Amirante to let defendant go. Amirante was still holding defendant by her hair. Suranovich grabbed at Amirante's arms and repeatedly told him to stop. Amirante did not release defendant until a man came over and stepped between them. Security officers soon arrived and separated defendant from Amirante. He continued to yell at defendant after they were separated.

¶ 44    Defendant testified that she is five feet, three inches tall and that Amirante is taller. She was surprised at Amirante's strength given his age. His punches to her face caused her pain. After their altercation, her face hurt and felt swollen. She also received scrapes to her feet and knees from being on the ground, but those injuries did not hurt immediately.

¶ 45    Asked if she struck Amirante, defendant replied, "Not knowingly." Asked if she "actually did strike [Amirante] multiple times," defendant answered no. She added that she "had [her] arms up flailing," but she denied striking Amirante while she was flailing. If she caused any injuries to Amirante's face, it might have been when she "swiped his glasses." She denied spitting on him, scratching him with a pen, or even seeing a pen during the incident. She did not recall screaming profanity at Amirante, but she assumed that she did at some point. She also denied striking, or trying to strike, Suranovich with a pen or otherwise.

¶ 46    Defendant testified that, when the police arrived, she was upset and winded from the struggle. She spoke first to Officer Guzman, who took her personal information but did not interview her about the incident because he was not the reporting officer. Guzman referred her to Chapin. Defendant testified that Chapin "cut [her] off in the middle of [her] talking," yet she acknowledged that she told Chapin everything that she was now testifying to. Defendant denied telling Chapin that she left her car in order to "confront" Amirante. She reported to Chapin that defendant struck her multiple times with his fists and knee and that her whole face was hurt and swollen. Chapin replied that defendant's face was swollen because she was crying. Defendant also claimed to have told Chapin that she had bruises around both eyes and to have shown him a bleeding cut on her right hand. She asked officers at the scene to take photographs of her but they did not. Defendant became upset because she felt that Chapin did not believe her account. Defendant did not ask Chapin for an ice pack for her face but did ask for emergency medical attention. Neither Chapin nor any other officer asked defendant to provide a written statement of what happened.

¶ 47    Defendant identified defense Exhibits 10 and 11 as photographs that a friend took of her on the day after the incident. The photos show bruises around both of defendant's eyes and on her left ear. Defendant was asked why Chapin would not have taken a photo of her at the scene if

she had the bruises depicted in those photos. Defendant answered, "I didn't have a mirror to see myself, so I don't know, but the bruising didn't happen immediately." She testified that she first noticed the bruises on her face when she was treated in the emergency room after the incident. At that time, no police officers were present to take her photo. When she was arrested later that day, she "didn't have a chance to talk" and so could not ask officers to take photos of her injuries.

¶ 48 Defendant testified that, on October 4, several days after the incident, she went to Good Samaritan to ask if any other witnesses had come forward. She was informed that the case was closed and that she would have to consult with the police. Later that day, she went to the Downers Grove police station and met with Glaser. She asked to provide Glaser a written statement, but he declined because Chapin was the reporting officer on defendant's case. Glaser did, however, offer to take photos of defendant. She identified defense Exhibits 2 through 4 as the photos that Glaser took of her on October 4, showing bruising to her left eye, left shoulder, and left forearm. Defendant testified that she did not have these injuries prior to her altercation with Amirante.

¶ 49 After defendant testified, the defense rested. During its deliberations, the jury sent a note asking the court to "further define 'bodily harm.' " With the agreement of the parties, the trial court responded that " 'bodily harm' means physical harm."

¶ 50 The jury found defendant guilty on count II (striking Amirante and scratching him with a pen—contact of an insulting or provoking nature) but not guilty on count I (striking Amirante and scratching him with a pen—bodily harm) and count III (spitting on Amirante—contact of an insulting or provoking nature).

¶ 51 Defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court erred in excluding evidence of Amirante's 1962 aggravated battery conviction. Defendant noted that she would have presented the evidence in the least prejudicial way, namely, by introducing the conviction alone and not the circumstances of the offense. The court reaffirmed its decision that the danger of unfair prejudice substantially outweighed the probative value of the conviction, which was "very minimal" given the age of the conviction and Amirante's lack of subsequent criminal history. The court denied the motion for a new trial.

¶ 52                                              C. Sentencing
¶ 53 In advance of sentencing, defendant submitted a report from her counselor. Defendant told the counselor that she was having symptoms of post-traumatic stress disorder ever since Amirante "attacked" her in the parking lot. She claimed to have encountered Amirante twice since the incident. On one occasion, Amirante smirked at her, and on the other occasion, he followed her through a store and asked how she was.

¶ 54 At the sentencing hearing, the State recommended 12 months of conditional discharge, based on (1) Amirante's age, (2) defendant's "ridiculous" testimony that she approached Amirante just to ask if he had seen her waiting for the parking space and would be willing to give it up, and (3) defendant's admission that she had used the same tactic with other people in parking lots, which suggested that defendant has a problem with anger control.

¶ 55 Defendant called Pauline Sung, who testified that she first met defendant at church about a year ago. They both had young children and would have play dates together. Sung characterized defendant as thoughtful and generous. Defendant was involved in charitable

activities through the church and was always ready to volunteer to help others. Defendant did personal favors for Sung, such as babysitting and house sitting. According to Sung, defendant had been unable to find employment in her field of pharmacy. Defendant's husband was steadily employed but defendant had the greater earning potential.

¶ 56 Defense counsel stated that defendant was 37 years old, had a 2-year-old son, and was pregnant with her second child. Counsel described the impact that the criminal prosecution was having on defendant's pharmacy license:

"[H]er license expires March 31st of 2018, and she needs to renew it. However, as a result of this, her license in California—she has a license here in Illinois, because of this incident and while she's on any form of sentence, that license is suspended.

So, Judge, if this—her sentence needs to be terminated and her ability to expunge it before she can be able to do her profession, what she spent years and spent a lot of money attempting to do and become is a pharmacist. With her license expiring then, she would need to reapply as if it was a license for the first time, that's additional CLE's, additional fees and fines that she otherwise would not be able—or be required to do."

Counsel noted that defendant had been cleaning houses for income. She was forced to sell many of her possessions, including her car, and was on public assistance.

¶ 57 Defendant gave a statement at sentencing. She described how she cared for her parents and grandparents when they had health problems. She also described her education and research activities in the pharmacy field. She was "diabetic chair" for two years at Midwestern University. She had presented her research at conferences and in a journal article. She had been involved in various kinds of community service.

¶ 58 Defendant stated that, because of her prosecution, she had been unable to find employment in her field. Her family had suffered financially. They had sold some of their belongings, including their car, and had depleted their savings and retirement funds. They were on public assistance and had to borrow from their church.

¶ 59 Defendant claimed that the September 2016 incident was "shocking." Her "goal was never to harm Mr. Amirante but just to ask him about the situation, and [she] was just trying to escape when things happened, so [she] was in self-defense." The incident caused her "severe posttraumatic stress" and she was afraid to leave her house.

¶ 60 Defense counsel recommended court supervision. Counsel cited several mitigating factors: (1) defendant had no other criminal history, (2) her conduct did not threaten or cause serious bodily harm, (3) she acted in self-defense, having been "induced" by Amirante, and (4) the incident was "a result of circumstances unlikely to occur again."

¶ 61 In imposing sentence, the court made the following remarks:

"The trial on this case was heavily contested on both sides. The Court, in its various rulings during the trial, found that the evidence was sufficient to support the jury verdict, and the Court continues to believe that the jury verdict in this case, based upon the evidence that the Court heard at the trial, was a reasonable verdict.

The Court considers the nature of the conduct here, as presented by the evidence and indicated by the jury verdict. The Court also considers the age of the victim in this case. I acknowledge and consider the evidence on—that was presented on both sides, including, as I think the defense focused on to some extent is the impeachment

- 12 -

evidence of the victim in this case. The Court acknowledges there was \*\*\* evidence of impeachment of the victim. The jury verdict I think evaluated that impeachment, and still the Court finds that the jury verdict was reasonable.

I note a couple of things in relation to that finding by the Court. From the evidence it appears undisputed that it was the defendant who was the aggressor in terms of the circumstance here. Certainly it's a contested issue as to who was the aggressor as to any physical contact in terms of the substance of the incident and the allegations here, but I do find that it was the defendant who was the aggressor originally to start the circumstance. As I've indicated, the Court feels the jury verdict was reasonable in light of the evidence.

The Court also heard the testimony of the defendant and finds there was credibility issues with the defendant's testimony based upon the evidence and the fact that some of the testimony appeared to be contradicted by the evidence in the case.

Again, the Court finds that the jury considered all of this evidence and its verdict was reasonable, and the Court thereby respects the verdict of the jury. By the same token, I consider the testimony of the character witness here presented by the defense, the letter presented by the defense regarding defendant's circumstances, the fact that there's no criminal history of the defendant, a substantial factor in mitigation. I consider also the defendant's statement and her personal circumstances, as argued by the defense, that go to mitigation in the case, so I consider those circumstances, family circumstances, dependency circumstances and the like in fashioning a sentence."

¶ 62 The court noted that, in addition to the general sentencing factors in aggravation and mitigation, it considered the specific criteria for ordering court supervision (see 730 ILCS 5/5-6-1(c) (West 2016)):

"There are essentially three factors, and they are—some of them are broad—whether or not there's a public interest in a judgment of conviction or not having an interest in a judgment of conviction, the interest of justice, and then also whether or not the Court can make a finding that there's not a likelihood of any future offenses.

The Court has reviewed those factors and considered those factors in the light of the circumstances here and the nature of the conduct that is supported by the jury verdict."

¶ 63 The court determined that supervision was not appropriate and sentenced defendant to 12 months of conditional discharge and 40 hours of community service.

¶ 64 Defendant filed a motion to reconsider the sentence. Defendant urged again that supervision was the more appropriate sentence. The trial court denied the motion, reasoning:

"When I considered the original sentence, the Court considered not only the threat or cause of harm as an aggravating factor but also the combination of that with the victim's age in this case. The Court felt the jury's verdict was sustained by the evidence, particularly in light of the fact that the Defendant was the aggressor. And based on, also, the Court's review of the evidence and the Defendant's own testimony, the Court \*\*\* considers the jury verdict to be supported by the evidence.

Given those factors in aggravation and the combination of those factors in aggravation, the Court—[m]indful of the considerations that are relevant to court supervision sentencing, based on those two factors, the Court felt at the time that \*\*\* a conviction was an appropriate sentence based on the interest of justice, based on the

nature of the facts here, and also based on the interest of the public in that judgment. Considering those factors—and there's also the factor of whether or not there's a likelihood of future offense.

Considering those factors and also considering the defense argument—I understand the defense argument regarding the potential hardship. Given the aggravating factors that the Court has pointed out originally and still believes—the victim's age and the cause of harm and threatened harm in this case—I'm going to reaffirm the sentence that I originally imposed."

The court added that the sentence was "a very modest sentence" that "serves the purpose of holding an individual accountable for an act such as this against an individual who is of elder years."

¶ 65    Defendant filed this timely appeal.

¶ 66                                    II. ANALYSIS

¶ 67    On appeal, defendant contends that (1) the trial court erred in excluding evidence of Amirante's 1962 conviction of felony aggravated battery, (2) the jury's guilty verdict on count II was logically inconsistent with the jury's not-guilty verdicts on counts I and III, (3) the evidence did not support the guilty verdict on count II, and (4) defendant's sentence was excessive. We reject all four contentions.

¶ 68                      A. Exclusion of Amirante's 1962 Conviction

¶ 69    To evaluate defendant's claim of error in the exclusion of Amirante's 1962 conviction, we provide some legal context.

¶ 70    Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving, beyond a reasonable doubt, not only all the elements of the charged offense, but also that the defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004). Self-defense has several elements, one of which is that the defendant was not the aggressor. *Id.* at 225. If the State negates any element of self-defense, the defense fails. *Id.*

¶ 71    In her motion *in limine*, defendant claimed that, under *Lynch*, Amirante's conviction was relevant to the question of who was the aggressor in the conflict at Good Samaritan on September 28, 2016.

¶ 72    *Lynch* involved a murder prosecution in which the defendant moved for the admission of evidence that the victim had three prior battery convictions. The trial court denied the motion, and the appellate court affirmed. The supreme court reversed. The court held that "a victim's aggressive and violent character may tend to support a theory of self-defense in two ways." *Lynch*, 104 Ill. 2d at 199-200. The court explained these two avenues for admission:

"First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can only consider facts one knows, however, and evidence of the victim's character is irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature ***.

- 14 -

Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether the defendant knew of this evidence at the time of the event is irrelevant." *Id.* at 200.

The court reiterated this latter ground for admission: "[W]hen the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Id.* at 201-02. Turning to the facts of the case, the court held that the victim's prior battery convictions were admissible because (1) the evidence was conflicting as to who was the aggressor in the conflict that led to the victim's death and (2) the convictions were evidence of a violent character. *Id.* at 201-04.

¶ 73    In the present case, defendant moved for the admission of Amirante's conviction pursuant to the second part of *Lynch*'s holding, which allows evidence of the victim's violent tendencies where self-defense is raised and the evidence is conflicting as to who was the aggressor. This component of *Lynch* was codified in Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011), which states: "In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct."

¶ 74    Defendant argues that it was error for the trial court to apply the balancing test of Rule 403 and weigh the probative value of Amirante's conviction against the danger of unfair prejudice. According to defendant, "[s]uch an analysis is not required under *Lynch*," and if the danger of prejudice is to be considered at all in weighing the admissibility of *Lynch* evidence, it is the danger to the defendant from *excluding* such evidence. Prejudice to the State is not, according to defendant, a valid consideration under *Lynch*. Consistent with this position, defendant in her opening brief does not even acknowledge the basis on which the trial court found that Amirante's conviction carried the risk of undue prejudice to the State. Instead, defendant claims that the admission of Amirante's conviction was compulsory under *Lynch* simply because the conviction was of a crime of violence and there was conflicting evidence at trial as to who was the aggressor.

¶ 75    Defendant's view of the law is erroneous because she misreads *Lynch* and, more importantly, fails to recognize the scope of Rule 403. First, as to *Lynch*, defendant cites the following passage to show that the supreme court intended for courts not to consider prejudice to the State in judging whether to admit evidence of the victim's violent character:

"Convictions for crimes of violence *** are reasonably reliable evidence of a violent character. Such evidence is ordinarily inadmissible against a defendant for the purpose of proving the offense charged, because the danger of prejudice outweighs the relevance of the evidence where the defendant stands to lose his liberty or even his life if convicted. Where the victim's propensity for violence is in question, however, the danger of prejudice to the defendant lies in refusing to admit such evidence, while its high degree of relevance and reliability remains constant." *Lynch*, 104 Ill. 2d at 201-02.

¶ 76    We recognize that, in this passage, the court did not identify prejudice to the State as a factor. But defendant infers too much from the omission. In our view, the court's aim in this passage was to contrast how a conviction of a crime of violence—"reasonably reliable evidence of a violent character"—should be viewed depending on whether it is the defendant's

or the victim's criminal history that is sought to be admitted. Specifically, the court was noting how prejudice to the defendant is calculated differently in these two scenarios: in the first scenario, *admission* of the evidence might unduly prejudice the defendant, but in the second scenario, *exclusion* of the evidence might unduly prejudice the defendant. The court was not providing an exhaustive discussion of the factors relevant to admissibility, nor was it suggesting that the danger of prejudice from excluding evidence of a victim's violent character compels the admission of such evidence in every case. Notably, following the quoted passage, the court went on to address the State's argument that the victim's prior battery convictions were insufficiently probative because their underlying facts were not known from the record. *Id.* at 202-04. The court ultimately rejected the argument, concluding that the convictions themselves were "probative enough of aggressive and violent tendencies" (*id.* at 203), but what matters for our purposes here is that the court considered, if not the interest of the State as a party, then at least the interest in the integrity of the fact-finding process.

¶ 77 The parties dispute whether post-*Lynch* cases consider prejudice to the State in judging the admissibility of *Lynch* evidence. Defendant cites cases where prejudice to the State is not identified as a factor—at least not expressly. See, *e.g.*, *People v. Bedoya*, 288 Ill. App. 3d 226 (1997). Subsequent to *Lynch*, the supreme court decided *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001), where, applying the abuse-of-discretion standard, it affirmed the exclusion of *Lynch* evidence. However, the court did not engage in a probative/prejudicial balancing, apparently because the court determined that the evidence in question did not meet the minimum threshold of relevancy. See *id.* at 457-58. Some appellate court decisions since *Lynch* appear to recognize prejudice to the State as a valid factor in judging the admissibility of *Lynch* evidence. See *People v. Booker*, 274 Ill. App. 3d 168, 172 (1995); *People v. Harris*, 224 Ill. App. 3d 649, 650-53 (1992). Indeed, consideration of prejudice to the State would be consistent with the historical treatment of probative/prejudicial balancing as a catchall test for evidence. See *People v. Turner*, 373 Ill. App. 3d 121, 131 (2007) ("We note that the basic test for admissibility of any evidence *** is whether its probative value outweighs its prejudice."); *People v. Klimawicze*, 352 Ill. App. 3d 13, 27 (2004) ("Courts must weigh the probative value of any evidence against its prejudicial effect.").

¶ 78 Ultimately, however, it is academic whether *Lynch* and its progeny require considering prejudice to the State. The present case is governed by the Illinois Rules of Evidence. Rule 403 is titled "Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time," and it states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 79 Rule 403 functions under the evidence rules as the final threshold for admissibility; evidence otherwise admissible under the rules must meet its criteria. See *People v. Thompson*, 2016 IL 118667, ¶ 54 (opinion testimony meeting the requirements of Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) must also satisfy Rule 403); *People v. Ross*, 2018 IL App (2d) 161079, ¶ 164 (other-crimes evidence otherwise admissible under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) must comply with Rule 403). Thus, evidence that meets the requirements of Rule 405(b)(2) must also meet those of Rule 403, where the threat of "unfair prejudice" from the admission of the evidence is, obviously, prejudice to the State. A trial

court's balancing of probative value and prejudicial impact is reviewed for an abuse of discretion. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 84. Defendant argues for *de novo* review because Amirante's conviction of aggravated battery is undisputed, but she fails to see that the balancing process itself deserves deference.

¶ 80    As noted, because of her erroneous belief that prejudice to the State is not a factor in the admissibility of *Lynch* evidence, defendant neglects in her opening brief to offer any substantive argument on prejudice. In fact, her opening argument does not even acknowledge why the trial court believed that Amirante's 1962 conviction was prejudicial, *i.e.*, that the conviction was too remote in time and defendant intended to introduce it without providing the underlying circumstances. Defendant does address the issue of prejudice in her reply brief, but points raised for the first time in a reply brief are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Even if we were to relax the forfeiture rule, we would reject defendant's argument as she presents it. She cites *Lynch*, which we agree tends to undercut the trial court's position that she needed to provide factual context for Amirante's 1962 conviction. See *Lynch*, 104 Ill. 2d at 203 ("In general, battery is *prima facie* probative enough of aggressive and violent tendencies to be admissible."). As for the trial court's finding that Amirante's 1962 conviction was too remote in time to have adequate probative value, defendant criticizes this as a "blanket" finding that lacked "detail or explanation as to what prejudice would have resulted." We ourselves have no difficulty imagining why a trial court would exclude a 55-year-old conviction where there is no evidence of subsequent criminal history. Defendant forfeits this point by failing to articulate any substantive argument on remoteness or cite case law on the issue (*e.g.*, *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 49 (collecting cases to show that "remoteness in time is a valid consideration in determining whether it is reasonable for the trial court to allow the admission of evidence pursuant to *Lynch*")). See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not supported by argument or citation to authority are forfeited).

¶ 81    For these reasons, we find no error in the exclusion of Amirante's 1962 conviction of aggravated battery.

¶ 82                                    B. Inconsistency of Verdicts

¶ 83    Defendant contends that the jury's verdicts of guilty on count II and not guilty on counts I and III are logically inconsistent because they are necessarily premised on conflicting assessments of Amirante's credibility. Neither party in this case appears to recognize that, after *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003), inconsistency in a jury's verdicts is no longer an independent ground on which to challenge a conviction. A defendant's ability to challenge his conviction on sufficiency-of-the-evidence grounds provides adequate protection against any juror irrationality or other error exhibited in inconsistent verdicts. *Id.* at 148. Defendant indeed makes such an evidentiary challenge here, to which we now turn.

¶ 84                                    C. Sufficiency of the Evidence

¶ 85    Defendant challenges the sufficiency of the evidence to support her battery conviction. As noted, self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving, beyond a reasonable doubt, not only all the elements of the charged offense but also that the defendant did not act in self-defense. *Lee*, 213 Ill. 2d at 224-25. The elements of self-defense are (1) unlawful force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was

necessary, (5) the defendant subjectively believed a danger existed that required the use of the force applied, and (6) the defendant's belief was objectively reasonable. *Id.* at 225; see also 720 ILCS 5/7-1 (West 2016). If the State negates any one of these elements, the defense fails. *Lee*, 213 Ill. 2d at 225.

¶ 86     On appeal, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.* It is the function of the jury, as the trier of fact, to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *Id.* It is also the function of the jury to resolve conflicts or inconsistencies in the evidence. *Id.* The jury's ability to observe the demeanor of witnesses while testifying gives it a superior vantage point for judging credibility. *People v. Leger*, 149 Ill. 2d 355, 390 (1992). The reviewing court draws all reasonable inferences in favor of the prosecution and does not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Hardman*, 2017 IL 121453, ¶ 37. A court will reverse a criminal conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*

¶ 87     Defendant was convicted on count II, which charged her with making contact with Amirante of an insulting or provoking nature, namely, striking him in the head and face with her fist and scratching him on the forehead with a pen.

¶ 88     Self-defense has many elements, but defendant's challenge focuses on who was the aggressor. She notes that Suranovich and Adesugba first observed the fight while it was in progress and did not witness how it started. Only defendant and Amirante testified to the inception of the fight, and their accounts conflicted as to who was the aggressor. Defendant makes several challenges to the credibility of Amirante's testimony that defendant initiated contact and first launched a physical attack. In evaluating defendant's challenges to Amirante's credibility, we are mindful that "even contradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, she testified truthfully." *People v. Gray*, 2017 IL 120958, ¶ 47. The fact finder is charged with deciding how flaws in parts of a witness's testimony affect the credibility of the testimony as a whole. *Id.* Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief. *Id.*

¶ 89     First, defendant asserts that Amirante's testimony that he grabbed and held on to her hair was inconsistent with his claim that she was the aggressor. If she were the aggressor, defendant asserts, Amirante "would try to get away from her, rather than keep her in close proximity with the ability to allegedly continue striking him in the head." We disagree that flight would be the only reasonable response under the circumstances. Amirante testified plausibly that defendant's attack left him no time to think and that his first reaction was to try to restrain her. When he failed to grab her arms, he grabbed her hair. Not only is flight from an aggressor hardly the only reasonable reaction, it is not the legally required one. As the jury in this case was instructed, a nonaggressor need not attempt to escape the danger before using force against the aggressor. Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (4th ed. 2000); see *In re D.N.*, 178 Ill. App. 3d 470, 475 (1988).

¶ 90     Defendant also contends that Amirante's testimony that she scratched him with his pen was implausible because (1) she could not have known that Amirante had the pen because it was,

- 18 -

by his account, held in the front pocket of a shirt that he wore underneath a sweater that buttoned up the front; (2) Amirante testified that he threw the broken pen aside, rather than give it to the police as evidence, but the police found no pen at the scene; and (3) Amirante testified that defendant swiped at Suranovich with the pen, yet Suranovich herself testified that she did not observe defendant with a pen.

¶ 91    These points do not persuade us that no rational jury could have accepted Amirante's testimony about the pen. Amirante's claim that defendant wounded him in the forehead with the pen was corroborated by Suranovich, who testified that she observed a "puncture wound" on Amirante's forehead, and by State Exhibit 1, which shows a rivulet of blood flowing from Amirante's right upper forehead. The jury could have reasonably found this evidence compelling enough to compensate for the shortcomings defendant identifies. For instance, during a struggle of the intensity described by Amirante and defendant, Amirante's sweater could well have "opened up," as he testified, and exposed the pen in the shirt pocket underneath. The jury could have reasonably concluded that Suranovich simply failed, amid the fracas, to observe defendant wielding the pen—or that Suranovich failed to remember it afterward. The jury also could have reasonably accepted Amirante's testimony that he improvidently tossed aside the broken pen.

¶ 92    Next, defendant cites discrepancies between Amirante's testimony and his statements to the police, both at the scene and later at the police station.

¶ 93    As to what Amirante reported at the scene, Chapin testified that he did not recall Amirante claiming that defendant spit on him. Chapin also testified that Amirante did not claim to have located the pen that defendant used to scratch him. Later in his testimony, after having his memory refreshed with his police report, Chapin noted that his report reflected no claim by Amirante that defendant scratched his face with her fingernails or swiped at Suranovich with the pen. Chapin testified that he would have included such "pretty significant" details if Amirante had reported them.

¶ 94    As for Amirante's written statement, defendant notes that it does not contain these details: Amirante grabbed and held on to defendant's hair, Suranovich tried to stop the altercation, defendant swiped at Suranovich with the pen, and Amirante's blood sac ruptured during the struggle.

¶ 95    Notably, we do not have the benefit of Amirante's own account of what he reported at the scene and why he reported it; he was not queried along those lines. He was, however, asked why he omitted details from his written statement. His explanations were not consistent; at one point, he claimed that he included all the details he could remember at the time, while at another point, he claimed that he would have included more details but believed that he was limited to the front side of the single piece of paper he was given. As defendant stresses, the latter rationale was contradicted by Chapin, who testified that he offered Amirante additional paper.

¶ 96    We stress that our benchmark is not how credible Amirante appears in our own eyes but how credible he would appear in the eyes of a rational fact finder. Contradictions, such as those in the explanations Amirante offered about his written statement, do not necessarily render a witness's testimony incredible *in toto*. See *Gray*, 2017 IL 120958, ¶ 47. Moreover, while certain details were omitted from both of Amirante's statements to the police, certain other details were included in both statements, namely, that defendant struck Amirante in the face and stabbed him in the forehead with his pen. A rational jury could have credited Amirante for

consistently reporting this conduct, which was the basis for count II, while forgiving him for omitting other details.

¶ 97    Defendant cites *People v. Smith*, 185 Ill. 2d 532 (1999), *People v. Schott*, 145 Ill. 2d 188 (1991), and *People v. Quintana*, 91 Ill. App. 2d 95 (1968), to support her attack on Amirante's credibility. Defendant provides only cursory, parenthetical statements of the holdings of those cases. This approach provides us little appreciation for how the facts in those cases compare with the facts here. Nonetheless, we find those cases readily distinguishable from the present case.

¶ 98    In *Smith*, the victim was shot and killed outside a bar. Only one witness testified that the defendant was the shooter, but the supreme court held that her testimony was not credible because (1) her account of the shooting conflicted with other witnesses' accounts, (2) she was repeatedly impeached with her written statement to a defense investigator, (3) she failed to report the shooting for two days, and (4) she had a motive to fabricate because an alternative suspect in the shooting was her sister's boyfriend. *Smith*, 185 Ill. 2d at 542-44.

¶ 99    The defendant in *Schott* was charged with sexually abusing his stepdaughter. The supreme court held that the victim's testimony was not credible:

> "Not only does the record show that she admits to be a person who lies 'a lot'; but, in addition, the record shows that she was impeached numerous times and her testimony was so fraught with inconsistencies and contradictions that we find her testimony so lacking in credibility that a reasonable doubt of defendant's guilt remains." *Schott*, 145 Ill. 2d at 206-07.

The court noted, as an example of impeachment, that the victim admitted that she had fabricated a sexual abuse accusation against her uncle because she was upset with him. *Id.* at 207. The court commented that the victim "also had a motive to falsely accuse the defendant because she wanted him to leave the house." *Id.*

¶ 100   The defendant in *Quintana* was tried for possession of marijuana. The arresting officer testified that he was driving when he saw the defendant crossing the street. When the defendant spotted the officer, he bent down and threw two packages under a car. The officer claimed that, from his vantage point, he recognized the packages as of the size and shape commonly used to store marijuana. He retrieved the packages and arrested the defendant. No witness corroborated the officer's account. *Quintana*, 91 Ill. App. 2d at 96. In the defendant's testimony, he denied any connection to the packages that the officer allegedly retrieved. A police chemist testified that the packages contained marijuana but were " 'not the general run of packaging.' " *Id.* at 97. The appellate court held that the officer's testimony was not credible. The court based this holding on the chemist's testimony, the trial court's expressed skepticism toward the officer's account, and the prior relationship between the officer and the defendant. Specifically, the defendant testified that the officer had been harassing him for months to have him become a police informant. *Id.* at 97-98.

¶ 101   Defendant claims that Amirante's credibility was as damaged as that of the witnesses in *Smith*, *Schott*, and *Quintana*. According to defendant, Amirante's motive to fabricate—to avoid prosecution for his physical attack on defendant as described by her and Adesugba—was as powerful as the motives of the witnesses in those cases. Even if this were true, the present case would still be distinguishable from *Smith*, *Schott*, and *Quintana*, where not only did the witnesses have motives to fabricate but their testimony lacked corroboration and was thoroughly contradicted in material aspects. By contrast, Amirante's testimony that defendant

struck him and stabbed him in the forehead with his pen was consistent with his prior statements to the police and with State Exhibit 1's depiction of bloody marks on Amirante's face and an apparent wound to his forehead. Suranovich also substantially corroborated Amirante's account of defendant's attack. Amirante did omit some details from his statements to the police, and give inconsistent explanations for the omissions in the written statement, but this impeachment did not approach the level seen in *Smith*, *Schott*, and *Quintana*.

¶ 102 Of course, in assessing Amirante's credibility as to who was the aggressor, we cannot ignore the converse question of defendant's credibility. It was defendant, after all, who admitted that she initiated contact with Amirante. She testified that she approached Amirante only to ask whether he had noticed her waiting for the parking space and would be willing to relinquish it to her. She claimed to have used this method previously in parking lots and did not "see any problem" with it. Chapin testified that defendant admitted approaching Amirante in order to "confront" him. Defendant denied saying this to Chapin, but a rational jury could find that defendant's intentions were, in fact, not innocent as she claimed.

¶ 103 In addition to her arguments on credibility, defendant contends that "any physical contact [she] may have had with Amirante was not knowing and voluntary." Instead, "[h]er contact with Amirante was either due to her 'flailing arms' as a result of being restrained by him ***, or was the result of self-defense in light of Amirante's sudden physical aggression towards her after only verbally approaching him." The State asserts that this argument is forfeited because defendant did not raise it at trial. We disagree. Defendant testified at trial that she did not strike Amirante, or at least not "knowingly," and that the bloody marks on Amirante's face as seen in State Exhibit 1 might have been caused when she "swiped his glasses." Defense counsel argued along those lines in closing, holding the State to its burden of proving the elements of battery, including that defendant knowingly made the alleged contact with Amirante. Therefore, we reject the State's forfeiture argument.

¶ 104 However, we also reject defendant's argument on the merits. There was sufficient evidence for a jury to conclude that defendant knowingly struck Amirante and also stabbed him in the forehead with his pen.

¶ 105                                                D. Sentencing

¶ 106 Defendant argues that the trial court abused its discretion in sentencing her to conditional discharge rather than supervision. We disagree.

¶ 107 Criminal sentences in Illinois "shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Section 5-6-1(c) of the Unified Code of Corrections (Code) (730 ILCS 5/5-6-1(c) (West 2016)) provides that, except for certain classes of defendants, "[t]he court may, upon a plea of guilty or a stipulation by the defendant of the facts supporting the charge or a finding of guilt, defer further proceedings and the imposition of a sentence, and enter an order for supervision of the defendant." Section 5-6-1(c) further states:

> "If the defendant is not barred from receiving an order for supervision as provided in this subsection, the court *may* enter an order for supervision after considering the circumstances of the offense, and the history, character and condition of the offender, if the court is of the opinion that:
>
>> (1) the offender is not likely to commit further crimes;

(2) the defendant and the public would be best served if the defendant were not to receive a criminal record; and

(3) in the best interests of justice an order of supervision is more appropriate than a sentence otherwise permitted under this Code." (Emphasis added.) *Id.*

"[S]ection 5-6-1(c) provides that a defendant meeting all of its guidelines *may* be sentenced to supervision, but *need not be* so sentenced." (Emphases in original.) *People v. Hall*, 251 Ill. App. 3d 935, 941 (1993). Thus, "[s]upervision is not a right of any defendant, but a sentencing alternative to be employed in the discretion of the court." *People v. Price*, 247 Ill. App. 3d 787, 790 (1993). A sentencing determination is entitled to great deference and will not be disturbed unless it is at great variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 108    We address first defendant's complaint that the trial court unduly emphasized one of the aggravating factors in section 5-5-3.2(a) of the Code (730 ILCS 5/5-5-3.2(a) (West 2016)), namely, whether "the defendant's conduct caused or threatened serious harm." Defendant claims that this "was the only factor present in aggravation, out of 30 factors." Defendant misconceives the relevance of section 5-5-3.2(a) here. The factors in aggravation in section 5-5-3.2(a), and the factors in mitigation in section 5-3-3.1(a) (*id.* § 5-5-3.1(a)), are for the court to consider in deciding what, if any, sentence of imprisonment to impose. See *id.* (specifying factors that "shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment"); *id.* § 5-5-3.2(a) (specifying factors that "shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5-8-1 or Article 4.5 of Chapter V"). Defendant was sentenced not to imprisonment but to conditional discharge. She claims that she should have received supervision instead. This specific issue is expressly governed by section 5-6-1(c), which provides its own criteria.

¶ 109    Defendant contends that, though "the court recited the appropriate factors" under section 5-6-1(c), "the record is devoid of a fair consideration of court supervision as an alternative to the sentence of conditional discharge imposed." We disagree. Section 5-6-1(c) directs the court to consider "the circumstances of the offense, and the history, character and condition of the offender." *Id.* § 5-6-1(c). The trial court expressly considered, and conscientiously weighed, the seriousness of the offense, defendant's lack of criminal history, and the financial hardship that she and her family had experienced because of this prosecution. The court did appear to accentuate the seriousness of the offense, but we cannot say that this was error. The seriousness of the offense is generally considered the most important sentencing factor. See *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001). In any event, the weight to be assigned each sentencing factor, and the balance between the factors, are matters within the sentencing court's discretion. *People v. Lefler*, 2016 IL App (3d) 140293, ¶ 31. A reviewing court may not disturb a sentence merely because it would have weighed the sentencing factors differently than did the trial court. *Alexander*, 239 Ill. 2d at 213. The court here appropriately emphasized the gravity of defendant's attack on a senior citizen. The court noted the "harm and threatened harm." While defendant was acquitted on count I (bodily harm), the trial court could find, by a lesser standard of proof, that defendant indeed caused bodily harm, if not by punching Amirante in the face, then by stabbing him in the forehead with his pen. See *People v. Rose*, 384 Ill. App. 3d 937, 941 (2008) ("[a] sentencing court may even consider evidence of crimes of which the defendant has been acquitted," because "a finding of not guilty is not a conclusive

finding that the defendant did not commit the crime, but rather means that the State was unable to offer proof beyond a reasonable doubt that he did"). Obviously, if the attack with the pen had deviated a slight amount, Amirante might have been struck in the eye. In our view, the court acted within its discretion in giving particular weight to the seriousness of the offense.

¶ 110    Defendant's remaining points are also without merit. First, defendant suggests that the not-guilty verdict on count I shows "the jury's struggle with the credibility of the witnesses at trial and the determination of what actually transpired in the parking lot that day." It is inappropriate for us to speculate into the reasons behind a jury's split verdicts. See *People v. Radford*, 2018 IL App (3d) 140404, ¶ 46 (citing *Jones*, 207 Ill. 2d at 133-34).

¶ 111    Second, defendant claims that the trial court "lacked conviction as to who started the physical altercation." Defendant fails to consider the court's remark in context. The court noted that the evidence was conflicting "as to who was the aggressor as to any physical contact," and the court offered its own opinion that defendant "was the aggressor originally to start the circumstance." However, the court ultimately deferred to the jury's verdict and held defendant responsible for what the jury considered an unjustifiable use of force.

¶ 112    Next, defendant notes that a trial court may order supervision if it finds, *inter alia*, that the defendant is not likely to commit further crimes (730 ILCS 5/5-6-1(c)(1) (West 2016)). Defendant considers it significant that the trial court here did not find that she was likely to commit further crimes. Defendant is correct that, in both imposing sentence and addressing the motion to reconsider, the trial court mentioned the recidivism prerequisite without finding that defendant did not satisfy it. However, the court did expressly state that the case did not meet the remaining two prerequisites, *i.e.*, that "the defendant and the public would be best served if the defendant were not to receive a criminal record" and that "in the best interests of justice an order of supervision is more appropriate than a sentence otherwise permitted under this Code" (*id.* § 5-6-1(c)(2), (c)(3)). A court must find all three prerequisites satisfied before it may order supervision.

¶ 113    Defendant also submits that, in preventing her from working as a pharmacist, the trial court failed to give due regard to the constitutionally mandated goal of restoring her to useful citizenship (Ill. Const. 1970, art. I, § 11) and that, "[c]learly, the public would be best served by the Defendant working without a criminal record thereby avoiding the need to seek government aid." The parties disagree over what the record shows regarding the impact of a criminal conviction on defendant's pharmacist's license. According to defendant, she cannot keep her license as long as she has a criminal conviction, but the State claims that defendant can renew her license once her sentence is served. Defense counsel, however, conceded at oral argument that defendant "very well may be able" to renew her pharmacy license now that she has completed her sentence. In any event, we decline to disturb the sentence imposed. In a thoughtful discussion of the relevant sentencing factors, the trial court acknowledged the financial detriment to defendant and her family but concluded that the seriousness of the offense outweighed that factor. We will not disturb a sentence simply because we might have weighed the sentencing factors differently than the trial court. See *Alexander*, 239 Ill. 2d at 213.

¶ 114    Defendant would have us focus on the fact that she received conditional discharge rather than supervision. But defendant's sentence is in better perspective if we consider the entire range of punishment to which she was subject. The Class A misdemeanor of which she was convicted carried a maximum sentence of 364 days' imprisonment. See 720 ILCS 5/12-3(a)(2)

(West 2016); 730 ILCS 5/5-4.5-55(a) (West 2016). Also, given Amirante's age and the public location of the attack, the State could have charged defendant with the felony of aggravated battery. See 720 ILCS 5/12-3.05(d)(1) (West 2016) (battery to a person 60 years of age or older is aggravated battery); *id.* § 12-3.05(c) (battery on a public way is aggravated battery); *People v. Williams*, 161 Ill. App. 3d 613, 619-20 (1987) (private parking lot accessible to the public is a public way for purposes of the aggravated battery statute). Had defendant been convicted of a felony, she would not have been eligible for supervision at all. See 730 ILCS 5/5-6-1(c) (West 2016). Given these charging and sentencing options, we cannot say that a sentence of 12 months of conditional discharge for a violent attack on a senior citizen was an abuse of discretion.

¶ 115                                III. CONCLUSION

¶ 116       For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County. As part of our judgment, we grant the State's request that defendant be assessed statutory state's attorney fees as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 117       Affirmed.