NOTICE

Decision filed 10/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220762-U

NO. 5-22-0762

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Coles County. |
| | ) | |
| v. | ) | No. 18-CF-240 |
| | ) | |
| STEVEN A. COBB, | ) | Honorable |
| | ) | James R. Glenn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's sentence was not excessive, and the State proved defendant guilty beyond a reasonable doubt where the witnesses' testimony was not unworthy of belief, and the State provided sufficient evidence of a purpose of sexual gratification.

¶ 2    Defendant, Steven A. Cobb, appeals his conviction and sentence. He argues the State failed to prove him guilty beyond a reasonable doubt and his sentence was excessive. For the following reasons, we affirm.

¶ 3                        I. BACKGROUND

¶ 4    Defendant was first charged in this case on April 20, 2018. After filing several amended informations and the court granting the State's motions to dismiss counts I and V, three charges proceeded to trial. Count II asserted that defendant committed aggravated criminal sexual abuse

1

between August 1, 2014, and March 21, 2017, by touching J.L.'s buttocks when J.L. was under the age of 13 years old in violation of section 11-1.60(c)(1)(i) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)). Count III asserted defendant committed predatory criminal sexual assault of a child in that, between August 1, 2014, and May 21, 2017, defendant committed sexual contact by touching J.L.'s vagina for the purpose of sexual gratification or arousal and J.L. was under the age of 13 years old when the act was committed in violation of section 11-1.40(a)(1) of the Code (*id.* § 11-1.40(a)(1)). Count IV asserted defendant committed aggravated criminal sexual assault in that, between March 22, 2017, and July 1, 2017, defendant committed sexual conduct with J.L. by touching her sex organ when J.L. was at least 13 years old and under 17 years old in violation of section 11-1.60(d) of the Code (720 ILCS 5/11-1.60(d) (West 2016)).

¶ 5    The jury trial began May 2, 2022. J.L. testified that she was born on March 22, 2004, and currently lived with her mom, stepmother, and three siblings. She stated that in 2011, when she was seven years old, defendant married her mom. They later had her two younger sisters. When she was 10 years old and in fifth grade, they lived in Charleston, Illinois, for a year. J.L. testified that at that time, defendant became physical with her, slapping and grabbing her buttocks. He also made her kiss him. J.L. described the slapping as an open palmed pat "in a sexual way." This occurred every day and all throughout their house, but not when other people were around. When asked why she felt it was sexual, J.L. stated it was not something she would normally see other parents doing with their kids. It made her feel uncomfortable. With respect to the kissing, J.L. stated that sometimes the kiss would be closed mouth but sometimes defendant would make her use her tongue. J.L. testified that she tried to say no and asked defendant to stop but he said it was okay because she was not his real daughter. Defendant would bribe her to do these things by

2

allowing her to go outside whenever she wanted or not do any chores. He also threatened that if she ever told anyone, her little sisters would grow up without a dad.

¶ 6    J.L. testified that around the fall of 2015, when she was 11, they moved to Windsor, Shelby County, Illinois. Defendant continued to grab her buttocks and make her kiss him every day. He also increased the physicality by making J.L. give him a "blow job" once when she was around 12 years old. She was watching TV in the living room while everyone was asleep. Defendant came to the living room and had J.L. move closer to him and kiss him. Defendant asked her to give him a "blow job," but she did not know what that meant. Defendant then explained oral sex to her. Defendant told J.L. if she performed oral sex, she would never have to do chores again and would be able to go outside whenever she wanted. When he told her that she could not tell anyone because her sisters would grow up without a dad, she agreed to perform oral sex, and defendant led her to the bedroom. J.L. testified she sat on her bed, defendant pulled his pants down, put his penis in her mouth, and then moved her head back and forth. When defendant was done, J.L. went to the bathroom to brush her teeth.

¶ 7    J.L. testified that in October 2016, when she was 12 years old and in the seventh grade, they moved to Mattoon, Illinois. Defendant continued to slap her buttocks and kiss her every day. Defendant also asked her to give him another blow job but J.L. refused. On one occasion, in defendant's bedroom, defendant stuck his hand down J.L.'s pants and touched the outside portion of her vagina. J.L. stated this made her feel uncomfortable and disgusting. Her siblings were home during this incident, but they were otherwise occupied. Defendant told J.L. not to tell her mom because her sisters would grow up without a dad. J.L. confirmed she would have turned 13 years old on March 22, 2017. She could not remember if he touched her vagina before or after her birthday but remembered it occurred around that time because there was still snow on the ground.

3

The State asked, "When you remember back to this incident, you said that there as snow on the ground is that right?" J.L. answered affirmatively. The State then asked, "Do you believe that this was before March 22nd?" J.L. stated, "Yes."

¶ 8     J.L. also testified that when they moved to Mattoon, Kaylie Anderson—J.L.'s current stepmom—worked with J.L.'s mom and needed help. So, after about a month of living in Mattoon, Anderson moved in with them.

¶ 9     J.L. testified that when defendant first started slapping her buttocks, she did not necessarily believe something was wrong but knew it made her feel uncomfortable. However, defendant made it sound like it was normal. She did not realize what was going on until she was older and defendant touched her in more places. J.L. stated that she was 11½ or 12 years old when she knew defendant was doing something wrong. J.L. testified that during this time she would cut her wrist with a razor blade when "everything in my head was too intense." She cut herself more than 10 but less than 20 times. She testified that she was worried about her sisters when defendant touched her and that her mom was at work during many of these incidents.

¶ 10    On cross-examination, J.L. testified that she only cut her left wrist. Throughout defense counsel's questioning, he showed J.L. several pictures of herself from when she was 10, 11, or 12 years old. J.L. agreed there were no obvious signs of injury to her left arm in any of the pictures.

¶ 11    J.L. agreed her biological father lived with her and her family from January to April 2017. Kaylie Anderson, her mom's previous coworker and current wife, also lived with them during that time. She denied that she told her father of defendant's actions when he lived at the house. J.L. agreed that defendant's mom also lived with them when they lived in Windsor.

¶ 12    J.L. confirmed that defendant and her mom divorced in July 2017. J.L. testified that, prior to the divorce, there was a time when she lived with defendant and her younger sisters while her

4

mom was elsewhere. She further stated that her mom and Kaylie Anderson married in November 2017. J.L. agreed, after the allegations of abuse "came to light," her mom petitioned the court to move her younger siblings with them to Minnesota, where Anderson is from.

¶ 13    J.L. remembered being interviewed by Child Advocacy Center (CAC) but did not remember saying that she cut both of her wrists during that interview. J.L. testified that during the CAC interview, she said she first told her best friend, K.A., about defendant touching her. J.L. further testified that she "technically" told her mom first, in the fall of 2016, after defendant made her perform oral sex but then "took it back." When she told her mom, defendant yelled throughout the house that she was going to get his kids taken away from him and her mom went to the front porch to talk to her about it. J.L. confirmed that defendant still lived with her family after she first told her mom. She told K.A. after her mom and defendant were divorced. J.L. did not remember telling the interviewer that defendant got on top of her while on the couch and touched her, but she did not disagree with anything said on the videotaped interview because "obviously I've had to say it at one point." Defense counsel asked if J.L.'s testimony was that the vaginal touching happened in her mom's bedroom where there was no couch. J.L. answered affirmatively. She agreed that her interview was in December 2017, which was closer in time to January through April of 2017 than her testimony at trial. J.L. did not remember telling Anderson about defendant's actions after her mom did not believe her. She also did not remember telling the interviewer that she told her mom about the abuse on three separate occasions.

¶ 14    Defense counsel again asked if J.L. disclosed the abuse to her mom more than once. J.L. testified that she told her mom about the abuse once and took it back when she noticed her mom crying and defendant yelling that she would get her little sisters taken away from him. J.L. did not remember her mom calling Windsor police at that time. Defense counsel asked if J.L. remembered,

5

during her CAC interview, saying "I tried telling her twice." J.L. stated that she told her mom twice, "took it back the first time and \*\*\* continued throughout my story on the second." J.L. did not remember saying "She believed me a little bit more the second time, then a month or two after the second time is when she left." Defense counsel then played a portion of J.L.'s CAC interview. J.L. testified she did not remember telling the interviewer that she spoke with her mom a second time but "clearly I had to say it." When defense counsel indicated that J.L.'s mom did not believe her, J.L. stated that she never said her mom did not believe her, but her mom never got the full story because she recanted what she said.

¶ 15　J.L. testified that she was treated at LifeLinks for her mental health treatment and went to a doctor about three times from age 10 to 13 years old. She agreed she never disclosed the abuse or her self-harm. She also agreed that she did not disclose defendant's abuse at a mental health visit with Eliza Smith on November 2, 2017, or at a visit with Noelle Cope on January 9, 2018, which was after her mom remarried Anderson and J.L. was no longer living with defendant. She further agreed that she knew how to report bad events.

¶ 16　J.L. testified that she never told her mom about the second time defendant asked for oral sex or that he touched her vagina. She further agreed that she did not tell any counselor, her reverend, any doctor, or anyone at her school about defendant's actions.

¶ 17　On redirect examination, J.L. clarified that she first disclosed the abuse to her mom in October or November of 2016 at the Marion Street house in Mattoon. J.L. clarified that she first said something to her mom inside the house, and her mom asked her to talk on the front porch. Before J.L. got to the porch, defendant ran through the house, talking about how he was going to lose his kids and that J.L. was lying. Eventually, J.L. and her mom made it to the front porch. When J.L. started telling her mom about defendant's abuse, her mom began to cry. Due to her

6

mom crying and defendant yelling, J.L. retracted her statement. J.L. testified that the situation made her scared to tell other people because she did not know how people would react and did not want her mom to cry. J.L. stated that she told her mom a second time in July or August 2017, after she told her friend, K.A. and K.A. persuaded J.L. to tell her mom. J.L. testified after telling her mom, she wanted to keep it private and did not want to tell the police or counselors. J.L. stated that she did not frequently cut herself and tried to hide cutting her wrists. J.L. agreed that the pictures defense counsel showed her did not clearly show her left wrist. The State asked J.L. about her relationship with her dad during the time of defendant's abuse. J.L. stated the relationship depended on the sobriety of her father and she could not trust him because he did not follow through on promises when he drank alcohol. She did not feel comfortable telling her dad about the abuse. The State then directed J.L.'s attention to the several medical appointments raised by defense counsel. J.L. stated she saw someone different for each appointment and was never comfortable enough with any of them to disclose the abuse. J.L. testified that no one told her to lie, and her testimony was the truth.

¶ 18     On recross-examination, J.L. agreed that she told the CAC interviewer that Tony and Cassie Vaultonburg's home was where she felt safe. The Vaultonburgs were friends with her mom and defendant. J.L. did not remember telling Noelle Cope on January 9, 2018, that "I told my mom's girlfriend and she helped me tell my mom."

¶ 19     On redirect examination, J.L. explained that Tony Vaultonburg worked with her mom and Tony introduced defendant to her mom. J.L. would go to the Vaultonburgs' house in Mattoon to get out of her house so that defendant could not abuse her. J.L. babysat the Vaultonburgs' son. J.L. testified that she did not feel comfortable telling the Vaultonburgs about the abuse.

7

¶ 20    J.L.'s mom, Mary Anderson, testified that she currently lived with her wife and her four children in Minnesota. Mary stated that the father of her oldest child, J.L., was Bryan L. The father of her two youngest children was defendant. She and defendant married on October 10, 2010, and divorced in the summer of 2017. Throughout their relationship, Mary was employed and working eight-hour days Monday through Friday. Defendant was never employed during their relationship.

¶ 21    Mary stated they lived in Charleston, Illinois, in 2014 or 2015, when J.L. was in fifth grade. At that time, J.L. attended Charleston schools. Mary testified that when J.L. was in sixth grade, they moved to Windsor. While in Windsor, defendant's mom stayed with them briefly. Mary testified that around September 2016, they moved to a house on Marion Street in Mattoon. In October or November of 2016, Mary's coworker, and now wife, Kaylie Anderson, moved in with them.

¶ 22    When asked to describe J.L.'s behavior from when Mary married defendant to the time they moved to Charleston, Mary said J.L.'s behavior was "uneventful" and "normal adolescent behavior." Mary did not notice a significant change in behavior while they lived in Charleston except J.L. was less outgoing and more anxious to be with friends. Mary testified that she noticed concerning behavior after they moved to Windsor. Mary stated that J.L. started to engage in odd behavior, including hiding and hoarding food. J.L.'s changed behavior continued when they moved to Mattoon. Mary stated that J.L. started to dress more modestly and became obsessive about a lot of things. The odd behavior stopped after her divorce.

¶ 23    On cross-examination, Mary did not remember when J.L. started medication for her anxiety and other mental health issues but stated J.L.'s behavior "dramatically" worsened between 2015 and 2017. At that time, J.L. struggled with her grades, hoarded food, and no longer spent time with friends.

¶ 24 Mary agreed that she took J.L. to LifeLinks for mental health treatment at some point but did not take J.L. for an evaluation after noticing her behavior changed. Mary agreed she took J.L. to LifeLinks several times in 2014 and J.L. did not go to LifeLinks for treatment in 2015, 2016, or 2017. Mary stated she offered to take J.L. for counseling when she exhibited odd behavior but J.L. did not want to go, so Mary did not think J.L. would gain anything from therapy. Mary did not remember taking J.L. to LifeLinks in January 2018. After defense counsel refreshed her memory with LifeLinks records, Mary remembered that LifeLinks suggested J.L. go to Gateway for treatment in May 2018 and when J.L. was at Gateway, she took J.L. out against medical advice. Mary testified that she removed J.L. from Gateway due to a family emergency in Minnesota and that J.L. was not suicidal. Mary stated she was not aware of J.L. cutting her wrists until November 2017. J.L. stopped cutting her wrists after the divorce.

¶ 25 Mary testified that, in October 2016, J.L. told her once about the abuse but retracted her allegations. Then, after Mary was divorced, J.L. told her a second time. Defense counsel asked Mary if she left her children with defendant for weeks in May 2017. Mary stated she left them alone with defendant for a maximum of two weeks because he refused to allow her to get them. Mary stated she had no reason to disbelieve J.L.'s retraction and she separated from defendant for different reasons.

¶ 26 Defense counsel directed Mary's attention to a verified petition for a no stalking no contact order filed by her on September 17, 2017. Mary agreed that she asked a Coles County judge to impose a no contact order between herself and defendant, including her children as protected parties. She sought a no contact order because defendant would follow her to and from work and harass her on social media sites. Defense counsel asked if Mary cited the abuse of J.L. in the

9

petition. Mary stated that she was advised not to disclose that information as it would notify defendant of an ongoing investigation.

¶ 27    Mary clarified that J.L. told her about the abuse the second time at the end of June 2017 and her divorce was finalized July 3, 2017. During the second disclosure, J.L. also told Mary that defendant touched her buttocks and forced kisses. Mary stated that she did not report the abuse to police but took J.L.'s accusation seriously and took her to counselors at Sexual Assault Counseling and Information Services (SACIS), who were mandated reporters that could handle the situation appropriately. Mary agreed SACIS counselors were not doctors. Mary agreed that when J.L. told her the second time, she was going through divorce proceedings and wanted all of her children with her. Mary disagreed that knowing about the abuse was key to her custody battle with defendant.

¶ 28    Defense counsel directed Mary's attention to J.L.'s mental health appointment with Eliza Smith on November 2, 2017, for J.L.'s anger issues. Mary agreed that the records did not state that Mary told Smith about the abuse at that time but stated "that doesn't mean that [J.L.] was not already getting care for that." On redirect examination, Mary testified that that she did not tell J.L. to make up this story so that she could get custody of her younger children.

¶ 29    At that time, the parties and court agreed to allow defense counsel to question Mary as a witness in the defense's case in chief, rather than recall her later. On defense counsel's direct examination, Mary stated she was with J.L. at her appointment with Noelle Cope on January 9, 2018. At that appointment, Mary did not hear her daughter say that Anderson helped J.L. tell Mary about the abuse.

¶ 30    Detective Alex Hesse of the Mattoon Police Department testified that the CAC forwarded a report to the Mattoon Police Department regarding J.L. He reviewed the videoed CAC interview

of J.L. and attempted to locate defendant. Based on the video, Detective Hesse knew Charleston Police Department and Windsor Police Department were also involved. Detective Hesse contacted those departments in an effort to locate defendant. He never had a conversation with defendant.

¶ 31   On cross-examination, Detective Hesse agreed that he did not interview anyone from any of the schools J.L. attended or J.L.'s medical providers. He was not aware that, at the time of the CAC interview, there had been multiple reports of nonsexual abuse of J.L. Detective Hesse agreed J.L. told the CAC interviewer that she cut herself due to sexual abuse and that he did not try to gather corroborating evidence that J.L. cut herself. He did not conduct an independent interview with J.L. Detective Hesse agreed that people sometimes lie during interviews and that people sometimes have a motive for making false allegations.

¶ 32   Noelle Cope, a nurse practitioner at Sarah Bush Lincoln Health Care Center, testified that she performed a sexual assault examination of J.L. on January 9, 2018. During her visit, J.L. disclosed that defendant touched her body in a couple of ways that made her feel uncomfortable. J.L. told Cope that the touching and kissing with tongue began when J.L. was in fifth grade. J.L. also said that defendant would allow her to get away with doing no chores for a kiss. J.L. stated that eventually defendant touched the outside of her vagina over clothing, and he squeezed and patted her buttocks. She stated the buttocks touching and kissing occurred often. J.L. also stated that she gave defendant a blow job on one occasion, but he asked for oral sex more than once. When asked about the oral sex, J.L. told Cope that one night when she was in sixth grade, defendant climbed on top of her, started kissing her, and asked for a blow job in exchange for J.L. getting out of doing certain things. J.L. performed the oral sex but still had to do chores. Defendant asked on other occasions, but she did not do it again. Cope testified that regarding the vaginal touching, J.L.

11

stated it happened more than once, and the touching was over the clothing. J.L. also reported self-harm to Cope. Cope stated that she did not see any scars or cuts on J.L.'s arm at that time.

¶ 33 Cope testified that her physical exam of J.L. was normal, as she expected based on J.L.'s disclosures. After refreshing Cope's memory with her notes from the examination, Cope testified that J.L. stated the vaginal touching first occurred over the clothes but then progressed to underneath her clothes later on in sixth grade.

¶ 34 On cross-examination, Cope agreed that J.L. stated she first told a friend about the abuse after moving to Charleston and that she was afraid to tell her mom because defendant told her that her mom would go to hell for being a lesbian. Cope also agreed that J.L. stated that she then told her mom's girlfriend, who helped J.L. tell her mom.

¶ 35 On redirect examination, Cope stated she would not necessarily expect to see scar tissue on someone who used a razor blade to cut their wrists just enough to bleed. Cope also testified that J.L. stated at the beginning of defendant's abuse, he told J.L. if she kissed him, she could go outside. When J.L. said no, she got extra chores, so after a while she finally just gave him a kiss.

¶ 36 The State rested. Defendant moved for a directed verdict, which the court denied.

¶ 37 The defense called Chief Ronald Bateman Jr. of the Windsor Police Department to testify. He stated that he started with the department in August 2017 and shortly after, was subpoenaed to locate any reports regarding defendant and J.L. Chief Bateman did not locate any records with those names.

¶ 38 Anthony "Tony" Vaultonburg testified that he sometimes goes by Tony and lives in Mattoon and was friends with both defendant and Mary before they started their relationship. Tony introduced Mary to defendant. He remained friends with defendant but had not seen Mary in several years. Tony also knew and had a good relationship with J.L. before the divorce. He

considered himself like an uncle to her. Tony stated that J.L. babysat his son a couple of times but it was not a regular thing. He confirmed that J.L. never told him about defendant's abuse.

¶ 39    Defense counsel directed Tony's attention to May and June of 2017. Tony testified that Mary left all her children alone with defendant for about 14 days or a little longer. No one could reach Mary or knew where she went. Tony agreed that during that time, he was around J.L. without defendant's presence and J.L. did not disclose the abuse. Tony testified that he once lived with defendant and Mary for about two weeks in April 2017. He never saw any cut marks on J.L.'s left wrist, even when she wore short sleeves.

¶ 40    Erik Van Hoveln testified that he had been superintendent of Windsor schools for 5 years and was a principal at Windsor schools for 11 years prior to that. He was familiar with J.L. Van Hoveln testified that he was unaware of any noted disclosures of abuse or any notations from the nursing department indicating J.L. was a cutter. He was also unaware of any academic struggles.

¶ 41    On cross-examination, Van Hoveln agreed, aside from his records, he had no independent knowledge of the facts of this case. He also agreed that no student disclosed allegations of sexual abuse directly to him as principal.

¶ 42    J.L.'s father, Bryan L., testified that he stayed with Mary and defendant for a period of time in 2014 and 2017 due to financial and employment issues. He agreed he stayed with them around January 2017. Bryan stated, after he lived with them in 2017, Mary told him that defendant abused J.L. Bryan testified that when he did not stay with Mary and defendant, he got visitation every other weekend with J.L. and his son. He never had to treat J.L. for cuts on her wrists. He further stated J.L. never disclosed defendant's abuse to him.

¶ 43    On cross-examination, when asked about his relationship with J.L. during 2014 through 2017, Bryan stated that it was not as good as he hoped and worsened when Mary got married a

fourth time. The State then asked if he saw any abuse, and Bryan said he stopped defendant from spanking J.L. with a belt when they lived in Charleston. Bryan later had a conversation with defendant about corporal punishment and defendant threatened to throw Bryan down the stairs. Bryan moved out when Mary and defendant separated. He agreed when he visited with the children, he never closely inspected their bodies for injuries.

¶ 44 Dan Haifley, senior pastor at Maranatha Baptist Church, testified that J.L. was a student of his for about a year and a half. He stated that J.L. never disclosed defendant's abuse to him and to his knowledge, she never made a disclosure to anyone in the organization. He also never had any indication that J.L. self-harmed.

¶ 45 Brenda Foster, who taught in Charleston from 2011 to 2019, and Jennifer Dryden, who taught in Charleston from 2001 to 2020, also testified. Both women completed separate behavioral evaluations of J.L. in the years relevant to the charged offenses. They both noted minor difficulties, including failure to finish schoolwork due to absences and talking too much. Neither woman had independent recollections of J.L. Both also stated that no officers or agency employees came to speak with them about J.L.

¶ 46 Angie Sowers, an employee of LifeLinks Mental Health, testified that on January 8, 2018, she worked as an access center coordinator. She did not remember J.L. The court allowed Sowers to refresh her memory with intake records, and Sowers testified that J.L.'s mom called the facility. Mary informed the facility that she was going through a divorce and J.L. had a history of cutting. The last time J.L. cut was a couple months prior to the call. Sower spoke with J.L.'s mom for 15 minutes. On cross-examination, Sowers stated that J.L.'s mom reported that J.L. was abused by her ex-stepfather.

14

¶ 47    Eliza Smith, a nurse practitioner at Sarah Bush, testified that she collaborated with Dr. Shana Sewell in November 2017. Upon refreshing her recollection with J.L.'s medical records, Smith testified that Dr. Sewell made a note to "please refer" to psychological evaluation for depression. Smith agreed there were no notations or complaints of sexual abuse. Defense counsel directed Smith's attention to a patient health questionnaire filled out by J.L. Smith stated that J.L. marked that she had no feelings of wanting to be dead or harm herself. J.L.'s mom, however, expressed fear of J.L. harming herself. Smith testified that she physically examined J.L. and did not observe scarring from cutting.

¶ 48    On cross-examination, Smith stated she had no independent recollection of seeing J.L. on November 2, 2017. She agreed that the patient health questionnaire did not ask if the patient had been the victim of sexual abuse or assault. Smith testified that at that appointment, J.L. reported anxiety and trouble concentrating in school. When asked if scars always resulted from cutting, Smith stated that it depended on the patient and the depth of the injury.

¶ 49    Carrie Davis, a licensed practical nurse at Sarah Bush who examined J.L. on November 2, 2017, and Nicole Ottens, an emergency surgeon at Sarah Bush who examined J.L. on July 28, 2015, also testified. Neither had any independent recollection of J.L. but agreed J.L.'s records had no indication that she self-harmed. Michelle Kinder, a nurse practitioner at Sarah Bush who cared for J.L. on July 28, 2015, and again in 2016, testified similarly.

¶ 50    Kaylie Anderson, Mary's wife, testified that she dated Mary for four months before they got married on November 17, 2017. In October 2016, prior to their romantic relationship, she lived with Mary, defendant, and their children in Mattoon, Illinois. Anderson stated that she had filed two separate petitions for an order of protection against defendant. The basis for the petition filed in September 2017 was that defendant frequently parked his truck at her residence and messaged

15

her through social media. She explained that defendant posted things about her, indirectly, on social media, and made a scene at a Walmart. The social media posts regarded her sexual orientation. Anderson stated that she had a good relationship with, and was close to, all of Mary's children. She further testified that she, Mary, and the children moved to Minnesota. Anderson stated that J.L. never disclosed defendant's sexual abuse to her.

¶ 51 Defendant testified he was married and lived with Mary from 2010 to 2017. By the time of their divorce in July 2017, they no longer lived together. Defendant denied ever touching J.L.'s vagina and buttocks. He also denied ever asking for or receiving oral sex from J.L. Defendant testified that on November 27, 2017, he went to pick up his kids from Mary, and she asked him if she and her wife could adopt his children and leave the state. Defendant responded with a firm no.

¶ 52 On cross-examination, defendant agreed that he complained to Vaultonburg that Mary would come home from work, pop a pill, and go to bed. He also agreed when that happened, he was the "one in charge." Defendant testified that during his entire marriage, he had never been completely alone with J.L. On redirect examination, defendant testified that around June 2017, he—alone—had all the children for about six weeks.

¶ 53 The defense rested and defense counsel moved for a directed verdict. The court denied the motion.

¶ 54 After deliberations, the jury found defendant guilty of aggravated criminal sexual abuse based on sexual contact with J.L.'s buttocks (count II). The jury found defendant not guilty of predatory criminal sexual assault and aggravated criminal sexual abuse based on touching J.L.'s vagina (counts III and IV).

¶ 55 On June 3, 2022, defendant filed a motion for judgment of acquittal notwithstanding the verdict and motion for a new trial. The motion argued, *inter alia*, that there was insufficient

16

credible evidence to convict. On September 2, 2022, the court allowed defense counsel to amend the defense's motion for an acquittal and new trial. Counsel filed said motion on September 22, 2022, and included the same insufficient evidence argument.

¶ 56    On October 14, 2022, the matter proceeded to hearing on the posttrial motions. Regarding the sufficiency of the evidence claim, defense counsel argued that only J.L., Mary, and Noelle Cope had evidentiary value with respect to the allegations. He further contended that J.L. and Mary's testimonies contradicted Cope's testimony, and vice versa.

¶ 57    The State argued that defense counsel did not give a holistic recount of the trial. It contended that J.L.'s testimony alone was sufficient to convict, and that defense counsel was confusing sufficiency with credibility. The State admitted there was one instance where Mary clearly disagreed with Cope's statements, but that did not defeat sufficiency. It asserted the jury did not have to believe one or the other 100%. It stated that defense counsel cross-examined all of the witnesses regarding these deficiencies and the jury heard that in making its decision. The court found the evidence was sufficient to convict and denied defendant's posttrial motions.

¶ 58    A sexual offender evaluation and risk assessment was filed on October 25, 2022. The evaluation placed defendant in the low-moderate risk category based on the Sexual Violence Risk Coding Sheet, the Static-99 Coding Sheet-Revised, and the STABLE 2007. The report also noted that defendant had additional risk factors and seemed "to have protective factors present as well."

¶ 59    The presentence investigation report (PSI) was filed November 7, 2022. The report noted that defendant had a prior battery conviction in 1998 and a pending predatory criminal sexual assault charge in Shelby County, Illinois. Defendant reported being diagnosed with anxiety, depression, and post-traumatic stress disorder. He was prescribed lamotrigine and trazodone. Defendant also reported suffering from an umbilical hernia, Peyronie's disease, and neuropathy.

He had been engaged in mental health services since May 2022. Defendant graduated from college and reported receiving social security disability income since he was 17 years old. He also reported being employed at Rural King in Mattoon, Illinois.

¶ 60    The sentencing hearing was held on November 23, 2022. Neither party presented evidence. J.L. read her victim impact statement to the court. Defense counsel stated that defendant would not make a statement in allocution due to his pending charges in Shelby County.

¶ 61    In making its argument, the State noted that despite defendant asserting he was close with his daughters, he was unable to state their birth dates or middle names at the sexual offender evaluation. It also noted that the evaluator stated that defendant did not appear to have any sense of guilt, shame, or remorse, and presented no empathy towards the victim. It argued there were no factors in mitigation. It further argued that the following factors in aggravation applied: (1) defendant's conduct caused or threatened serious harm, (2) prior criminal history, (3) necessity to deter others, and (4) defendant held a position of trust. The State asked the court to give the most weight to the last factor, arguing defendant took advantage of his stepdaughter and stole her innocence while telling her horrendous things like, "I would never do this to my real children." The State requested the court impose a sentence of seven years' imprisonment.

¶ 62    Defense counsel stated that defendant had a 1998 Class C misdemeanor conviction when he was 18 years old. He noted that the jury acquitted two types of conduct and compromised to reach the conclusion of guilt on the third. Counsel argued that defendant should not have to accept responsibility for something he disputed doing and should be able to maintain his innocence. He also noted that the final assessment was that defendant was at a low risk to reoffend. Counsel contended that a factor in mitigation was defendant's likelihood to comply with terms of probation. He noted that defendant was on pretrial release since 2018 without a single violation during that

18

time. Defendant respected the court's orders and followed them. Counsel also contended that the impact of defendant's incarceration on his four children was a mitigating factor. Defense counsel requested the court impose a 30-month period of probation with 174 days of stayed jail time and whatever counseling the court deemed appropriate.

¶ 63 The court stated it considered the PSI, sex offender evaluation report, the evidence at trial, the victim impact statement, arguments of counsel, all statutory and nonstatutory factors in aggravation and mitigation, and defendant's history and character. It stated while defendant had prior criminal activity, it found the factor in mitigation applicable where defendant led a law-abiding life for a substantial time prior to the commission of the present crime. It also found that defendant would be likely to comply with a term of probation based on his performance during pretrial and the conclusions of the experts. The court contemplated whether defendant's absence would negatively affect his children but determined there was no evidence presented in that regard.

¶ 64 The court found the applicable aggravating factors included: (1) that defendant caused or threatened to cause serious harm, (2) the necessity to deter others from committing the crime, and (3) defendant held a position of trust with the victim. The court then discussed the nature and circumstances of the offense, noting the frequency of the act, accompanied by threats, and that it involved grabbing and slapping J.L.'s buttocks, as well as kissing. The court stated it was not sure whether imprisonment was necessary for the protection of the public, although it may be necessary for other children defendant was around. In addressing whether probation would deprecate the seriousness of the conduct and be inconsistent with the ends of justice, the court stated probation would possibly not deprecate the seriousness of defendant's conduct if it had been one to three slaps of the buttocks. However, because there was a multitude of slaps, the extent and effect of his actions would deprecate the seriousness of his conduct and would be inconsistent with the ends of

19

justice. The court found that a sentence of imprisonment was appropriate and imposed a five-year sentence. Defendant timely appealed.

¶ 65                                   II. ANALYSIS

¶ 66    On appeal, defendant challenges the sufficiency of the evidence, arguing that J.L. and Mary were not credible, and the State failed to prove defendant touched J.L.'s buttocks with the purpose of sexual gratification. He also asserts his sentence was excessive.

¶ 67                          A. Sufficiency of the Evidence

¶ 68    Due process requires the State to prove each element of an offense beyond a reasonable doubt. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing the sufficiency of the evidence, it is not our function on review to retry defendant or "substitute our judgment for that of the trier of fact." *People v. McLaurin*, 2020 IL 124563, ¶ 22. Rather, we review challenges to the sufficiency of the evidence by determining "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. In so doing, we review the evidence in the light most favorable to the State, which means "that all reasonable inferences from the record in favor of the [State] will be allowed." *Id.*

¶ 69    Under this standard, circumstantial evidence is sufficient to sustain a conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64. Although not conclusive or binding on this court, we give great deference to the trier of fact's determinations regarding the weight afforded to the evidence and witness credibility. *People v. Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64. Here, the State had to prove defendant was over 17 years old and committed an act of sexual

20

conduct with a child who was under the age of 13 at the time of the offense. 720 ILCS 5/11-1.60(c)(1)(i) (West 2014).

¶ 70                           i. Believability of J.L. and Mary's Testimonies

¶ 71    Defendant first argues that J.L. and Mary's testimonies were so improbable, unconvincing, and contrary to the human experience that they cannot support his aggravated criminal sexual abuse conviction. He argues that deference to the fact finder does not extend to accepting testimony that is "so lacking in credibility that a reasonable doubt of defendant's guilt remains." *People v. Schott*, 145 Ill. 2d 188, 206-09 (1991). He contends the State's case rested on the credibility of J.L. and Mary. Defendant argues that J.L.'s CAC interview was inconsistent with, and thus diminished the value of, J.L. and Mary's testimony. He further contends the timing and circumstances surrounding the disclosures of the alleged abuse illustrated J.L. and Mary had a motive to falsely accuse defendant because the accusations benefited them in the custody dispute.

¶ 72    "A conviction will not be reversed simply because *** the defendant claims that a witness was not credible." *Gray*, 2017 IL 120958, ¶ 36. Eyewitness testimony may be found as insufficient proof of guilt " 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' " *Id.* (quoting *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004)). Contradictions do not necessarily destroy a witness's credibility. *Id.* ¶ 47; *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 96. This is particularly true where the inconsistencies do not regard the actions underlying the charge. See *Gray*, 2017 IL 120958, ¶ 47 ("where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable"); *Martinez*, 2019 IL App (2d) 170793, ¶ 96.

21

¶ 73    Here, while there were inconsistencies regarding J.L.'s disclosures and possibly inconsistencies regarding the touching of her vagina, J.L. consistently testified as to the buttocks slaps, kissing, and other details. Therefore, although the inconsistencies certainly speak to J.L.'s credibility, there is nothing in the record to conclude the alleged inconsistencies render J.L.'s entire testimony unworthy of belief. See *Gray*, 2017 IL 120958, ¶ 47. Rather, it was the trier of fact's duty to determine how these inconsistencies impacted J.L.'s credibility and believability. *Id.*

¶ 74    Defendant further argues that J.L.'s claims were wholly implausible where no one testified to seeing the buttocks slaps despite multiple people living at their home throughout the relevant time period. He also contends that no one ever saw signs of J.L. self-harming. We disagree.

¶ 75    While a multitude of people living at the house would certainly require a level of stealth in slapping J.L.'s buttocks, such action can happen swiftly and does not necessarily require preparation or leave an apparent sign that a slap occurred. As such, we do not find the fact that many people lived in the house removes the possibility of the crime all together.

¶ 76    Similarly, we do not find the lack of corroborating evidence of J.L.'s self-harm means her testimony was unworthy of belief. Despite the allegation that the self-harm began after defendant abused J.L., it is an ancillary matter. Moreover, it is not unfathomable that no one saw signs of self-harm where J.L. testified that she did not cut frequently and hid any marks.

¶ 77    The level of inconsistency or improbability here does not reach that in the cases cited by defendant in support of his position. Every case cited by defendant regards numerous instances of improbabilities and/or the victim being known for being untruthful. See *Schott*, 145 Ill. 2d at 206-09 (victim's testimony was unworthy of belief where she directly contradicted her previous statements of when the crime happened; she admitted to previously lying to the judge and falsely accusing her uncle of the same sexual abuse, she admitted to lying a lot; and she recanted the

22

allegations to several people); *People v. Yeargan*, 229 Ill. App. 3d 219, 233-35 (1992) (victim's testimony was unworthy of belief where no physical evidence supported victim's testimony that she was physically restrained and her clothes were forcibly removed while being sexually assaulted multiple times; no seminal material was found despite numerous alleged ejaculations; she oddly went to dark alley rather than a safer route after being followed by strangers; she followed defendant rather than fleeing after the act; her dog did not attack or flee during the act; victim continued to drink socially at bars afterwards; her testimony that defendant ejaculated five times in 15-20 minutes exceeded known parameters of sexual prowess; and her timeline was improbable); *People v. Coulson*, 13 Ill. 2d 290, 296 (1958) (victim's testimony was unworthy of belief where it was contradicted numerous times by other witnesses; his narrative that five codefendants voluntarily followed robbery victim to his home on the vague promise of more money and permitted him to go inside his home alone while they obligingly waited outside and thus trusted him to deliver on the promise rather than call the police was improbable; and he was reluctant to testify as to his activities during the evening); *People v. Smith*, 185 Ill. 2d 532, 541 (1999) (testimony of eyewitness to murder was unworthy of belief where she had a motive to lie, her testimony regarding the events leading up to the shooting contradicted more reliable, unrelated witnesses; she was repeatedly impeached with her previously signed statement, including her drug usage; and she did not tell police of the information she knew until two days afterwards when her sister was under suspicion of involvement with the murder); *People v. Herman*, 407 Ill. App. 3d 688, 704-06 (2011) (victim's testimony was unworthy of belief where she was admitted crack addict and high during the entire night of the alleged sexual assault; and her testimony was inconsistent and contradicted by other witnesses and/or physical evidence); *People v. Stevenson*, 25 Ill. 2d 361, 366 (1962) (witness testimony was unworthy of belief where witness stated

23

defendant pulled the trigger twice but the trigger was inoperable and witness's version of the events did not coincide with the physical evidence and was highly improbable). This is not a case "where the record showed the witness was a liar ***. Nor is this a case in which the witness' description of the actual crime was incredible on its face." *Cunningham*, 212 Ill. 2d at 284.

¶ 78    Defendant also contends that J.L. and Mary were not believable because they had a motive to lie. In support, he cites J.L.'s delay in disclosing the abuse until after Mary wanted to move to Minnesota, Mary's unfathomable action in leaving J.L. to live with defendant without Mary, and that the jury "wrestled mightily with J.L.'s credibility."

¶ 79    We first note that we will "not attempt to venture into the minds and deliberations of the jury to speculate about the jury's intentions." *People v. Kirkland*, 2013 IL App (4th) 120343, ¶ 24. Also, a delay in the reporting of the abuse itself does not render J.L.'s testimony untrustworthy. See *People v. Parker*, 2016 IL App (1st) 141597, ¶ 33 ("delay in reporting sexual assault may be reasonable where the victim's silence is attributed to fear, shame, guilt and embarrassment" (internal quotation marks omitted)). J.L. explained that her mom and defendant's initial reaction, as well as her fear for her sisters, made her not want to report the abuse. Such explanation was not unreasonable. We also do not find Mary's explanation that she was affording her daughter the autonomy to decide when to disclose her abuse to be improbable or unconvincing. Indeed, J.L.'s willingness to discuss the abuse was paramount in seeking help or pursuing justice.

¶ 80    While we ponder why a mother would leave her child with someone who she had a "grain of doubt" about potentially abusing the child, we cannot find it wholly unreasonable in allowing J.L. to stay with defendant given that J.L. recanted her initial disclosure of the abuse. Even assuming, *arguendo*, that J.L. disclosed the abuse a second time before Mary left, we do not believe the actions of one's mother should *per se* render the child's statements untrustworthy.

24

¶ 81   With that said, the timing of J.L.'s disclosure and Mary's actions support defendant's theory at trial that J.L. and Mary lied so that Mary could win a child custody dispute regarding her and defendant's children. However, motive to lie does not render their testimonies "unconvincing in and of itself," but rather is a consideration that the trier of fact must weigh. *People v. Sexton*, 162 Ill. App. 3d 607, 613 (1987). Defendant presented evidence of their motive to lie, and the issue was unquestionably before the jury. It was within the jury's purview to weigh the evidence and reject defendant's theory. See *Jackson*, 2020 IL 124112, ¶ 69.

¶ 82   Accordingly, we disagree with defendant's claim that J.L. and Mary's testimonies were unworthy of belief. His complaints speak only to the weight to be given to their testimonies. The jury here believed J.L. despite her inconsistencies and potential motive to lie. We will not substitute our judgment for that of the jury. *Gray*, 2017 IL 120958, ¶ 35.

¶ 83        ii. Element of Acting With the Purpose of Sexual Gratification

¶ 84   Defendant next argues the State failed to prove that he touched J.L.'s buttocks for the purpose of sexual gratification. He contends that without J.L. being able to point to something specific that made the buttock slaps sexual, her subjective feeling is insufficient to establish that defendant touched J.L. for the purpose of sexual gratification. He further argues there is nothing inherently sexual about slapping someone on the buttocks and here, the manner, location, and duration of the slaps on the buttocks are more akin to a sign of affection or a playful gesture than an act of sexual gratification. We disagree.

¶ 85   "Sexual conduct" includes the "knowing touching or fondling by the victim or the accused, either directly or through clothing, of *** any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2018). "Without evidence that the accused's actions were intended to sexually gratify

25

himself or the victim, 'an essential element of the crime is missing.' " *In re M.H.*, 2019 IL App (3d) 180625, ¶ 16 (quoting *In re A.J.H.*, 210 Ill. App. 3d 65, 72 (1991)).

¶ 86   Generally, an act being for the purpose of sexual gratification or arousal is not proven by direct evidence and often must be inferred by circumstantial evidence. *People v. Holmes*, 2018 IL App (3d) 160060, ¶ 20. A fact finder can consider whether anyone else was present, whether there was a legitimate, nonsexual purpose for the contact, and the victim and defendant's conduct before and after the offense. *People v. Ostrowski*, 394 Ill. App. 3d 82, 92-93 (2009)).

¶ 87   Viewing the evidence in the light most favorable to the State, defendant grabbed or slapped J.L.'s buttocks daily when no one else was around. J.L. felt uncomfortable and testified the slaps were not something she saw other parents do. See *Holmes*, 2018 IL App (3d) 160060, ¶ 22 (considering the subjective belief of the victim's brother in determining whether contact was for the purpose of sexual gratification). During the same time period, defendant was also inappropriately kissing J.L. (*People v. Calusinski*, 314 Ill. App. 3d 955, 961 (2000) (kissing with tongue is "an inherently sexual act")) and made further sexual advances. With regard to this other conduct, defendant bribed J.L. and threatened her not to tell anyone because her sisters would be taken away from their father. Based on this evidence, a rational jury could find defendant's contact with J.L.'s buttocks was for the purpose of sexual gratification.

¶ 88   Defendant argues that we should not infer his intent from uncharged, unsubstantiated conduct or any conduct of which he was acquitted. As such, we should not infer his intent based on J.L.'s unsubstantiated and rejected testimony regarding other alleged acts.

¶ 89   While the jury clearly found insufficient evidence for counts III and IV that concerned one act of oral sex, we cannot read into the jury's decision and speculate as to what elements it found unproven. See *People v. Mack*, 167 Ill. 2d 525, 536-37 (1995) (reviewing court should not

speculate as to the jury's "unexpressed conclusions"); *People v. Fisher*, 281 Ill. App. 3d 395, 405 (1996). However, even assuming the jury found the act of oral sex did not occur, defendant provides no authority to support his contention that his other uncharged conduct could not be relied upon in determining whether his buttocks slaps were for the purpose of sexual gratification or arousal or that such evidence required further corroboration. Illinois law allows evidence of other crimes to demonstrate intent. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); see also *People v. Foster*, 195 Ill. App. 3d 926, 951 (1990) (considered other sexual contact in determining whether other contact was for the purpose of sexual gratification). This is true even if the defendant was not charged or convicted of the conduct. *People v. Adams*, 2023 IL App (2d) 220061, ¶ 67. Importantly, defendant had the opportunity to cross-examine J.L.'s testimony in this regard and he does not challenge the admissibility of her testimony. As such, he fails to provide a sufficient reason for us to ignore this testimony.

¶ 90　　Given the secrecy, J.L.'s testimony, and defendant's other conduct, we find the State proved defendant acted for the purpose of sexual gratification. Accordingly, his insufficiency of the evidence claims fail.

¶ 91　　　　　　　　　　　　B. Excessive Sentence

¶ 92　　Defendant also argues that his sentence was excessive. While defendant concedes that he failed to file a postsentencing motion to preserve this issue, he urges this court to apply plain error, which may be invoked if "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Nevertheless, to obtain relief, defendant must first demonstrate that a clear error occurred. *Id.* We find defendant has not established an error occurred in this case.

¶ 93 Defendant contends the leap from the presumptive probation to any sentence greater than the minimum was excessive, considering his insignificant criminal background and the improbability that he will reoffend. He argues while the court based its determination on J.L.'s testimony that the buttocks slapping occurred every day, he was only charged with one count of aggravated criminal sexual abuse based on one occasion of touching J.L.'s buttocks. He contends that by the court's own reasoning, a sentence of probation would not deprecate the seriousness of his charged conduct, *i.e.*, touching J.L.'s buttocks once. As such, defendant asserts that given the mitigating factors, probation was the option consistent with the ends of justice or, alternatively, a minimum sentence.

¶ 94 The trial judge is afforded substantial deference in sentencing, because—unlike a reviewing court—it has an opportunity to weigh such factors as "defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court cannot reweigh the aggravating and mitigating factors in reviewing a sentence, nor can it "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We will reverse a sentence only when the trial court abused its discretion. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26.

¶ 95 A sentence that falls within statutory limits is presumed proper. *Id.* ¶ 28. The presumption is rebutted only where a defendant demonstrates that the sentence imposed "greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.* In determining the sentence, the trial judge must consider all relevant factors in mitigation and aggravation, and "balance the retributive and rehabilitative purposes of the punishment." (Internal quotation marks omitted.) *People v. Weiser*, 2013 IL App (5th) 120055, ¶¶ 31-32. The defendant's

28

potential for rehabilitation, however, is not entitled to more weight than the aggravating factors. *Id.* ¶ 32.

¶ 96 We reject defendant's argument that the court's reasoning for imposing a prison sentence was inconsistent with its view that slapping J.L.'s buttocks once or twice could warrant a probation sentence. "[U]ncharged criminal conduct is relevant in a sentencing determination." *People v. Flores*, 153 Ill. 2d 264, 296 (1992), *modified on other grounds by People v. Pitsonbarger*, 205 Ill. 2d 444 (2002). Despite defendant being charged and convicted of only one instance of slapping J.L.'s buttocks, J.L. testified that such occurred copious times over the period of years, as well as inappropriate kissing. The court's reliance on the numerous buttocks slaps to reject a probation sentence was therefore consistent with the logic it provided.

¶ 97 We also do not find that the five-year sentence of imprisonment was excessive. While defendant's lack of a significant criminal history and proven record of complying with court orders certainly provides mitigation, that information was presented to the court for its consideration and the court found those facts to be mitigating factors. However, the aggravating factors of causing or threatening to cause harm, nature and circumstances of the crime, necessity to deter others, and defendant holding a position of power were also applicable. The court was not required to attribute more weight to defendant's rehabilitative potential than the aggravating factors. *Weiser*, 2013 IL App (5th) 120055, ¶ 32. Under these circumstances, we find the court did not abuse its discretion by imposing a sentence at the midpoint of the statutory range and, thus, no plain error occurred. See *People v. Coats*, 2018 IL 121926, ¶ 32 (absent an error, there is no plain error).

¶ 98                                   III. CONCLUSION

¶ 99 Prior inconsistencies and motive to lie did not render the witnesses' testimony unworthy of belief. The State presented sufficient evidence of defendant's purpose of sexual gratification,

and defendant's sentence was not excessive. Accordingly, we affirm defendant's conviction and sentence.

¶ 100   Affirmed.